# EVANS v. BOLLING.

1. The credit of a witness may be impeached after the publication of his testimony, by *articles of impeachment*, upon the filing of which an order will be granted, that the party be at liberty to examine witnesses as to the credit of the witness whose testimony is impeached. Upon this examination, the only enquiry is, whether the witness is to be believed as a man of veracity, or not. No fact material to the issue can be enquired into; but if the witness, on his examination, had stated a fact falsely, *not in issue*, it may be contradicted. The 44th rule of chancery practice, dispensing with the necessity of filing "articles of impeachment," does not vary the case—the examination must still be confined to the credit of the witness sought to be impeached.

Evans v. Bolling.

2. The refusal to continue a cause, cannot be reviewed on error, in chancery, any more than at law.

3. A party has no right to amend his bill in a material point, after the cause is ripe for a hearing.

4. An affidavit of the loss of a bond, so as to let in secondary evidence of its contents, may be made in the body of the bill, or by a separate affidavit.

5. It is no ground for rescinding a contract for the sale of land, when it appeared that the vendee was put in possession of the land he intended to purchase, and the vendor intended to sell, although a part of the land was incorrectly described in the bond executed by the vendor for title; he being able and willing to correct the mistake, and to make title according to his contract.

6. A contract cannot be rescinded because the vendor had not title to a part of the land sold, when the contract was made, but which he obtained before any demand for title, or offer to rescind the contract by the vendee.

ERROR to the Chancery Court at Eutaw.

This was a bill filed by the plaintiff in error, to rescind a contract for the sale of land, upon the ground of fraud and misrepresentation. The complainant alledges that on the 1st of March 1837, he purchased from the defendant, Bolling, eight hundred acres of land, which he describes by its designation at the land office, and a number of slaves: That a bond was executed by Bolling for title when the purchase money was paid; that the consideration recited in the title bond was fifteen thousand six hundred dollars, of which sum four thousand four hundred dollars was the price of the negroes: this sum was payable in four annual instalments, for which notes were executed, with one Arrington as surety. The three notes first falling due were transferred by Bolling to one Earbee, by whom they were transferred to other persons.

The complainant alledges the fraud to consist in the false representation, by Bolling, that one of the tracts contained a valuable mill seat; that the bond for title omitted eighty acres of land sold to complainant, and to which Bolling had no title; that of the lands so sold and described in the title bond, there were three hundred and sixty acres to which Bolling had no title, and of which complainant never obtained possession; that these lands were then and still remain in the possession of four other persons, who are named; and that those lands constituted, with the supposed mill seat, a great and principal inducement to the purchase; that complainant did not discover the fraud for some time, as he

did not wish to cultivate the land, and did not discover it until searching for the mill seat.

The complainant further alledges, that the purchase of the land and slaves was not a joint purchase, but that the price of the slaves was included with the purchase of the land, for convenience only, and that after the purchase was agreed on, some corn, fodder, hogs, bacon, &c. were thrown in by Bolling; that after Earbee became the owner of the notes, he received from complainant the slaves, and credited two of the notes by the amount.

That after the discovery of the fraud, and by advice of counsel, he handed the bond for titles to the subscribing witness, and desired him to take it to the county clerk's office, prove it, and have it recorded, which he did, and the bond, after being proved, was copied on the record book. That some time after he applied for the bond, but after diligent search it could not be found, nor has he been able since to find it, and avers that it is lost, and files with the bill a true copy taken from the records of the office, as the best evidence in his power to produce. The different persons who have become interested in the notes executed by complainants, are made parties. The bill prays a recision of the contract.

Bolling answered the bill, and denies fully and unequivocally, all the fraud charged in the bill. He asserts that he was and still is the owner of all the land sold by him to complainant, and able to make title thereto, except eighty acres, which he knew he could procure when he made the sale, before he could be called on for the title, and has since procured. That the bond he executed for title, will, if produced and *not altered*, establish the fact, and he recites particularly the different tracts sold by him. That the land, slaves and other property were sold together, and constituted one entire contract—and that he was not privy to, or consenting to the sale of the slaves by complainant to Earbee. That before the purchase complainant went on the land, which respondent correctly described to him by its metes and bounds. That in relation to the mill seat he merely informed the complainant that he had been told by a previous owner of one of the detached pieces, that it contained a mill seat, and proposed to him to examine it, which he declined to do. That he made no representation which was not strictly true, and that the complainant well knew what land he was purchasing. That

complainant was in possession of, and resided on the land so sold during the years 1837 and 1838. He insists that the copy produced is not a true copy of the original bond, but is spurious.

Earbee answered the bill, and admits that he received the slaves from complainant, and credited the amount on the notes as stated in the bill. The answers of the other defendants are not important.

S. F. Miller, the witness to the title bond, deposed that he witnessed a bond for title to lands executed by Bolling in March, 1837. That in January, 1838, at the request of Evans, the obligee, he took the bond to the county clerk's office of Sumter, to be recorded, made oath to its due execution before a deputy clerk, James Keene, and delivered it to him to be recorded, having a short time previously read it over, and thinks it certain that if any alteration had been made in it, he should have discovered it; can not say whether the copy exhibited with the bill is a true copy, as he never compared it with the original.

James Keene, a deputy clerk, states that he received from S. F. Miller, on the 29th January, 1838, a bond from Bolling to Evans for titles to land, which was proved by Miller and recorded by him next day, and that the exhibit in the bill is a copy from the record, and thinks that after being recorded it was revised by him and another clerk. That the original remained in the office until complainant called for it, when it was handed to him, and thinks he put it in his bosom; whether he carried it away with him or not, cannot say—has never seen it since.

Stephens says he was a clerk in the office, but knows nothing of the title bond, or whether he assisted in revising it; but that if he did a true copy was made.

R. H. Smith, Esq. testified that in July, 1838, Bolling called at his office and desired to see the title bond, saying that he believed that in drawing the bond he had inserted the wrong numbers of land, and that if Evans was any part of a gentleman he would let him correct it, and insert the proper numbers. The copy was not then in the hands of Mr. Smith.

Much other testimony was taken, which, from the view of the case taken by the court, is unimportant.

Samuel H. Bolling, for defendant, testified that the land sold to complainant was correctly stated in the answer of the vendor. That he was the near neighbor of the vendee; saw him in posses-

sion of the land so purchased, on which he made two crops.—
Had frequent conversations with him about the land, in one of
which a dispute arising between them about the lines of the tract,
complainant on a piece of paper, described the lines of his tract,
which agreed with the land the vendor alledged he sold to him.
Other testimony was also adduced, which is sufficiently set forth
in the opinion of the court.

After the testimony of Bolling was published, the complainant
made affidavit that he was surprised by the testimony of S. H.
Bolling; that it was untrue, and that he could prove facts show-
ing its untruth, by proving that the witness had sworn differently
about the same matter on other occasions, and also by the proof of
other facts, show that the testimony of the witness was not true,
and moved the court to continue the cause, to enable him to make
this proof. This motion the court overruled, and also a motion
made at the same time for leave to amend the bill, by alledging
that J. H. Bolling, the vendor was insolvent.

The chancellor then proceeded to the hearing of the cause, and
dismissed the bill, from which decree this writ of error is prose-
cuted.

THORNTON and SMITH, for plaintiff in error—cited 1 Littell,
359; Cox's Dig. 135, 6; 1 B. & H. Dig. 156, sec. 13; 2 Bibb,
5, 200, 556; 3 Cranch, 270; 4 Dess. 149; 1 Porter, 259; 3
Porter, 125; 3 Bibb, 464, 539, 143; 6 Cranch, 9, 24; 1 Pe-
ters, 245; 1 Madd. C. P. 26, 7; 1 Monroe, 239; 7 ib. 445–514;
Litt. S. C. 358; 4 Munf. 254; 2 Sum. C. C. R. 316; Gress. Eq.
Ev. 140–3.

HAIR, contra.

ORMOND, J.—Some preliminary questions have been raised,
which it will be proper to consider before proceeding to the in-
vestigation of the merits of the case.

It is the settled law of this State, that an application to continue
a cause is addressed to the discretion of the primary court, and
cannot be reviewed here. To evade the force of this rule, it is
contended that the application made to the chancellor in this case,
and refused by him, though in form an application for a continu-

ance, was, in effect, the exhibition of articles of impeachment a-gainst the witness, S. H. Bolling.

The proper mode of impeaching the credit of a witness, is by the exhibition of *articles of impeachment.* They may be exhibited either before or after publication of the testimony, and on being filed, an order will be granted that the party be at liberty to examine witnesses on general interrogatories, as to the credit of the person whose testimony is sought to be impeached. [Lube's E. P. 99.] Upon this examination, no fact material to the matter in issue can be enquired into; but if the witness has voluntarily stated a fact, falsely, not in issue between the parties, it may be contradicted. [Wood v. Hammerton, 9 Vesey, 145; Carlos v. Brook, 10 id. 49; White v. Fussell, 1 Ves. & B. 151; 2 id. 267, note; Troup v. Sherwood, 3 J. C. C. 558.]

The 44th rule of chancery practice, dispensing with the filing of articles of impeachment, and permitting the testimony of witnesses to be impeached by deposition in the usual mode, has no influence on this question. In either mode the examination must be confined to the credit of the witness sought to be impeached.

The application, in this case was to continue the cause, that the complainant might prove, not that the witness was unworthy of credit as a man of veracity, or that he voluntarily swore falsely to any matter not in issue, but to prove, by the adduction of other testimony, and that too which the complainant must have known previously, that the facts sworn to by the witness, which were strictly within the issue, were untrue. This is never tolerated. Chancellor Kent says, "no art or stratagem can conduct the enquiry to the forbidden ground of the matter in issue." The reason is, that if such examinations were permitted, they would be resorted to in every case, and would be endless. There is not the slightest ground for considering this application as the exhibition of articles of impeachment. It is what it purports to be, a proposition to continue the cause to enable the party to adduce other testimony relating to the matter in issue, and the decision of the chancellor upon the application must be considered final.

Incorporated in the same application was a request, to be permitted to amend the bill by charging that J. H. Bolling, the vendor, was insolvent. In Bryant v. Peters, [3 Ala. 170,] we considered the question of the right of a party to amend his bill, and it was then held, that he had the right to amend it any time before

depositions were taken, no replication being filed to the answer. Here, the application was made after depositions taken on both sides, and the cause ripe for a hearing, and was therefore properly refused. In addition, it may be stated, that as the contract was impugned for fraud, it was unimportant whether Bolling was solvent or insolvent.

We do not think it important whether the affidavit of the loss of the bond for title, so as to let in secondary evidence of its contents, was incorporated in the bill, or made upon a distinct and separate paper. The substance of the affidavit of loss is, that after diligent search it cannot be found in the clerk's office, where it was deposited to be recorded, or among the private papers of complainant, and he has never been able to find the same. This is certainly open to the objection that it is very cautiously and guardedly drawn. It does not state the belief of the party that the paper is lost or destroyed, but that it cannot be found in two places which are named. From the view, however, which we take of the case, it is not necessary to pass on its sufficiency, and we will therefore proceed to the consideration of the merits of the case.

The purpose of the bill is to rescind a contract entered into between the complainant and the defendant, John H. Bolling, by which the latter sold to the former a tract of land of eight hundred acres, to a considerable portion of which the vendor, it is alledged, had no title or claim, but that the same was then owned by, and in the possession of other persons ; also, that eighty acres of the land so purchased, was designedly left out of the bond for title; also that the vendor fraudulently represented the land to be of better quality than it was, and that it contained a mill seat, when in fact there was none upon it. That the land so purchased, except eighty acres, was described in a bond for title executed by the vendor ; that the bond is lost, and a copy, taken from a record made of it in the county court clerk's office of Sumter, is appended to the bill as an exhibit.

The answer of Bolling is a full and explicit denial of all the material allegations of the bill. He states that the complainant well knew the land he intended to purchase, and did in fact purchase, and was put in possession of. That the copy of the bond for title exhibited with the bill, is not a true copy of the original, and he gives a description of the land sold, by its designation at the

land office, the title to which was then and is now in him, except eighty acres, to which he admits he had no title when the land was sold, but knew that he could obtain it before he could be called on for title, and has in fact obtained it.

The denial of the answer of all the supposed equity of the bill, brings the matter to a question of evidence—has the complainant proved his case, as required in a court of equity, so as to outweigh the denial of the answer?

The only proof offered by the complainant of the identity of the lands purchased by him, is the description of it contained in the bond for title. The original being alledged to be lost, secondary evidence was offered of its contents. This consists in the proof of the subscribing witness; that the original was executed in March, 1837, and that in January, 1838, at the request of complainant, he handed it to a deputy of the county clerk of Sumter to be recorded, and proved its execution. That at that time it was in the same condition as when executed; no alteration having been made in it.

James Keene, the deputy clerk who received the bond, deposes that he recorded it, and that the record thus made is a correct copy of the original. He thinks it was revised by him and another deputy, Mr. Stephens.

Stephens deposed that he had no recollection of the original, and could not say whether he had ever compared it with the record made by Keene, and therefore could not say whether the record made by Keene was or was not a correct copy of the original. Mr. Price Williams, the principal clerk, has never seen the original, and knows nothing of the correctness of the copy.

In the case of an office copy of an instrument required by law to be recorded, which the proper officer certifies to be a true copy of the original, the presumption of law, in the absence of proof to the contrary, is, that it is a true copy. The law casts on him the duty of being fully satisfied that the record which he has made is a faithful transcript of the original, and therefore his certificate is *prima facie* evidence of that fact. This bond was not by law required to be recorded, and its registration was a mere unofficial act, deriving no aid from the fact that it was made in the office of the county clerk.

The admission of secondary evidence, of the contents of an instrument alledged to be lost, is submitted to from the necessity

of the case ; but in the admission of such testimony, care should be taken that the party who is not in fault be not injured by the admission of proof rendered necessary by the negligence or misfortune of his adversary. In a case like the present, where the party against whom the secondary evidence is offered, is not in fault, and especially when he swears that the paper offered as a copy is not a correct copy of the original, the evidence ought to be such as not to leave a reasonable doubt of its correctness ; it ought to be such that the mind of the court or jury may repose on it with safety.

It is very clear that the only correct mode of ascertaining the correctness of a copy, is by the aid of another person, to compare it with the original; and indeed the books always speak of an *examined* copy as evidence, where the original cannot be produced. [Philips Ev. 457.] This was especially necessary in this case, where the important and debated portion of the deed, consisted of a list of separate tracts of land, which in copying, would furnish the transcriber no aid from the context. In the copy furnished, we find the south *east* quarter of section eleven, as one of the tracts sold, whilst the vendor in his answer, insists that it was the south *west* quarter of the same section. How easy it would be for a mistake of this kind to occur, every one will perceive. It is true, the clerk who transcribed it on the record book, says it is a correct copy of the original, but when asked whether the copy was compared with the original, he does not say positively that it was, but he thinks he compared it with Mr. Stephens. When Stephens is enquired of, he has no recollection of ever having seen the original, he knows nothing of any such comparion. As therefore the only test of the truth of the copy rests upon the fact that it was compared with the original, and as there is no proof but the belief, or conjecture, of the witness, that such examination was made, it would seem to follow that the correctness of the copy was not made out beyond a reasonable doubt.

In Taylor v. Riggs, [1 Peters, 600,] a witness, in proving the contents of a written instrument, had sworn to what was his impression and belief of its contents. In reference to which, C. J. Marshall says, " when a written contract is to be proved, not by itself, but by parol testimony, no vague, uncertain recollections concerning its stipulations, ought to supply the place of the written instrument itself. The substance of the agreement ought to

be proved satisfactorily, and if that cannot be done, the party is in the condition of every other suitor in court, who makes a claim which he cannot support." In this case, it is true, the supposed copy is in writing, but its validity, as a copy, depends upon its having been compared with the original, about which the witness is not able to state any thing with certainty. To the same effect are the remarks of Mr. Justice Story, in the United States v. 'Britton, [2 Mason, 468.]

We do not consider the testimony of Mr. Smith as affording any aid in establishing the correctness of the copy. It is evident that the vendor had been informed that the complainant had a copy of the bond, which did not correspond with his own statement of the lands he had sold, for which reason he desired to see it. The utmost effect that can be ascribed to his language during the conversation with Mr. Smith, is an admission that there might be a mistake, which, if it existed, he was willing to correct. It is proper also to state, that the objection of the chancellor, that the exhibit is the copy of a copy, is technically correct; this objection however, could be removed by the production of the record book from which the copy was made.

If the copy was shewn to be a true transcript of the original bond, it would have the same weight, as evidence, as the original, and would doubtless outweigh the denial of the answer. But as its correctness as a copy, rests on the mere belief, or opinion, of the witness Keene, it is not sufficiently established against the positive denial of the answer; the rule being that the denial of the answer can be countervailed only by the oaths of two witnesses, or by that of one with corroborating circumstances.

We are unable, however, to perceive that the case would be varied, if it were conclusively shewn that the copy was a literal transcript of the original bond. The true question is, what lands did Bolling sell, and the complainant purchase? And was Bolling able to make title?

The bill is exceedingly obscure on this important point, and it is only by inference that it can be ascertained from it, that the complainant supposed he was purchasing, and did purchase, from Bolling, the lands described in the exhibit to the bill, and eighty acres in addition, which he does not attempt to describe. The answer positively denies the sale of the two hundred and eighty acres described in the exhibit, to which the vendor had no title,

and describes each particular parcel of the eight hundred acres, which he alleges the complainant purchased and was put into possession of. The answer is supported in every particular by the deposition of Sam. H. Bolling. The witness was the near neighbor of complainant, knew the land and saw him in possession; had repeated conversations with him about it, in one of which he described the lands he had purchased, which corresponded with the land as decribed by the defendant in his answer, and that he made two crops on the land. In one of these conversations he told witness, that he intended to clear on the east half of the south west quarter of section 23, as it was better land than he expected to find it; yet this piece of land is not on the exhibit filed with the bill, nor a part of the land which the complainant alleges he purchased, but is a part of the land described in the answer.

The testimony of this witness has been assailed as improbable, but we can see nothing unreasonable or improbable in it; on the contrary, it is a material and probable account of an occurrence which frequently takes place between neighbors owning or living on adjoining tracts of land. But the testimony of this witness is strongly corroborated by the internal evidence arising from the facts as stated in the bill, and shown by the testimony. That one man should attempt to practice a fraud on another by selling to him, on a credit of four years, a large tract of valuable land, one third part of which belonged to, and was in the possession of five other persons, is only less wonderful than that any one could be found on whom such a fraud could be practiced, and be in possession for a considerable space of time, without discovering the fraud. The land which the vendor alleges he sold, lies principally together, six hundred acres of it being in a body and forming an oblong square, with two detached eighty acre tracts, and is proved to be much more valuable than the land alleged to be sold; the land the complainant says he purchased, takes one quarter section from the main body and removes it half a mile, detached from all the rest of the land.

Again, we find that when the complainant became dissatisfied with his purchase, and after Earbee had become the owner of three of the notes, his objection was not that the vendor had no title to the lands, but that the *quality* of the land had been misrepresented, and that one of the negroes was unsound. It does not

Evans v. Bolling.

appear when this conversation, at which Bolling was present, took place; but it must have been some time after the purchase, as we learn from the testimony that in August or September, of the year he purchased, he was highly pleased with his bargain, and further, it shows that he had then examined the land.

If, then, it was absolutely certain that the copy of the bond for title made by Keene was a correct transcript of the original, it would only establish a mistake, which as the vendor was willing and able to rectify, would be no ground for rescinding the contract, as it is perfectly clear from the answer and the proof, that the complainant obtained the lands he purchased, and that the vendor is able and willing to make title.

The alleged misrepresentations as to the quality of the soil, and the existance of a mill seat on one of the detached pieces, is denied in the answer, and there is no proof that such representations were made. To prevent misapprehension, however, it is proper we should say that it would not vary the case if they were proved as alleged in the bill. The purchaser must judge for himself as to all matters which lie in opinion merely; assertions by the vendor of the value or quantity of an article open to the inspection of the buyer, should pass for nothing; and if the purchaser, supinely resting on the interested opinion of the owner of the article he is endeavoring to sell, should find himself deceived. he must pay the price of his own folly; he cannot be relieved in chancery. [Camp v. Camp, 2 Ala. 635, '6.]

We do not consider it important that the vendor had not the title to eighty acres of the land sold, at the time of the sale, as he was able to make the title at the time the answer was filed, having procured it as stated in his answer, before the first note fell due. The question might have been very different, if a demand for title, and offer to rescind had been made before the vendor was in a condition to make title.

The result of our examination is a conviction that the decree of the chancellor, dismissing the bill, is correct, and it is therefore affirmed.