## EVANS AND ARRINGTON v. KEELAND.

1. The undertaking of a surety, is accessorial to that of his principal, and if
   the principal admits the contract to be binding on him, it is also binding on
   his surety, unless there be a fraudulent collusion between the debtor and
   creditor, to charge the surety.

2. A surety may avoid his contract for a fraudulent concealment, or misre-
   presentation of facts by the creditor, to induce him to become surety, al-
   though the contract for which he was bound as surety, is binding on his
   principal.

3. A misrepresentation which will have this effect, must be the false asser
   tion of a fact, and not the expression of an opinion, of the value, or quality
   of the property sold.   Thus, a declaration by the vendor, that the land he
   was selling, was as good, or better than other tracts to which he referred ;
   that there was a comfortable dwelling-house, good out-houses, peach or-
   chards, &c. on the land—is the expression of an opinion, and not the as-
   sertion of a fact, the incorrectness, or falsehood of which, would enable the
   surety to avoid his contract.

Error to the Circuit Court of Sumter.

DEBT on bond, by the defendant, against the plaintiffs in error. The defendant, Evans, permitted judgment to go by default, and Arrington pleaded in short by consent, fraud, and failure of consideration.

Upon the trial of these issues, it appears by a bill of exceptions, that the bond sued on, was the last of four executed by Evans, to one Bolling, for the purchase of a tract of land, negroes, horses, cattle, &c., and that Arrington was the surety of Evans. That in a conversation which took place in the house of Arrington, in the year 1837, when Bolling and Evans were bargaining for the property, one of the parties called in Arrington, to go Evans' security for the payment of the purchase money, when Arrington remarked, he did not like to put his name to such papers unless he had seen the land, and knew more about its quality. That Bolling then said, that Arrington need feel no apprehension, in signing the papers, and that the land was as good, or better, than some they had been talking about, and had seen the day before belonging to Bolling's father and one Willis Crenshaw. Bolling also stated, that there was a fine garden, good peach orchard, and fine improvements, a comfortable dwelling-house, and good smoke-house, stable and corn crib, and that one of the negroes sold was a good cook, house servant, and seamstress. These statements were made in the presence of Evans.

Evidence was then offered, tending to show, that the land was of inferior quality, and not so good as that of old Mr. Bolling, or Willis Crenshaw—that the buildings and improvements were inferior to what Bolling represented them, and that the negro girl was no seamstress, but a common field hand. There was also evidence tending to the conclusion, that two hundred acres of the land mentioned in the bond for title, was at the time of the sale, and still in the possession of, and belonging to other persons, and that the title to four hundred acres of the land, was not complete at the time of the sale; but has since been obtained by Bolling. That Bolling offered to take back the negro sold as a seamstress, but that Evans would not consent, unless he would take back all the other property. That Evans offered to rescind the contract

in the fall of 1837, at which time he had used, and consumed all the property, except the slaves, and abandoned the possession in the fall of 1838, of which he gave no notice. That in the fall of 1839, Evans charged Bolling with fraud in the sale—that Bolling told him to say nothing about it, that speculation was high, and he would help him to get it off on some one else, but denied the charge of fraud.

Upon this state of facts, the Court charged the jury, that if fraud by Bolling, the vendor, was clearly made out, it vitiated the contract as to the principal and security—That payment was resisted on the ground of fraud, and defendant might avoid the contract, either by a speedy repudiation of it, at an early day after the fraud was discovered, and a tender back of the property bought; or in regard to personal property, might insist upon a deduction, or might sue upon his warranty, if he have one—That Evans did not offer to rescind, and the contract being executory, had no warranty to sue upon—That the surety seeks to avoid the contract entirely, and the question is, has he made out his case?

From the form of the note, the contract is the same on Evans, and on Arrington, yet if Arrington was induced by the fraudulent representations of Bolling, to sign the note, that would avoid it as to him. That the case of such fraud as would avoid Arrington's liability, may be illustrated thus: If Bolling had represented to him that the note was given for land, and it was in fact given on a gaming consideration, this would be such a misrepresentation; but the vendor had a right to make any representation he might see proper, as to the quality of the property, and if the security chose to rely on it, it would not avoid his liability, because it was his duty to have examined into the matter himself: it is expected that all the parties will look out for themselves—sureties as well as principals. Still, the law extends more indulgence to the surety, than to the principal, and if they do not so enquire, the misrepresentation will not be a fraud. But if the surety could not have ascertained the truth of the representations by vigilance, he then might be relieved; but if by vigilance he could have informed himself of the truth of the facts, but chose to rely on the representations of Bolling, he cannot.

The defendant's counsel moved for the following charges to the jury :

1. That if they believed that Arrington was the surety of Evans, and Bolling knew the fact, and Bolling had no title to the land, of which want of title, both Evans and Arrington were ignorant, it constituted a fraud, of which the surety could take advantage at law, although Evans had neglected to tender back the property, and take the steps necessary to rescind the contract ; which the Court refused, and charged, that Arrington. the surety, would be bound, although he was ignorant of the want of title, if Evans failed or neglected to tender back the property, or offer to rescind the contract, as soon as he discovered the fraud

2. That the contract of suretyship, imports entire confidence, and good faith between the parties, in regard to the whole transaction, and that any concealment of material facts, or any express or implied misrepresentation of such facts, or any undue advantage, information, or surprise, taken of the surety by the creditor, will furnish sufficient ground to invalidate the contract ; which charge the Court gave ; but also charged, that if the surety could have examined for himself, the property sold to the principal, he should not have relied on the representations of the vendor, who had the right to speak of the qualities of the property, as he thought proper, as matter of opinion.

3. That the surety was not bound to examine the property sold, but might rely on the representations of the vendor made to him, respecting the same, and if the vendor made representations, that induced Arrington to undertake a greater, or other liability, than he supposed he was entering into, he might, by reason thereof, avoid his undertaking ; which the Court refused ; and charged, that it was the duty of Arrington to examine for himself, and that no representation made by the vendor, to Arrington, to induce him to become surety, would constitute a fraud of which he could take advantage, if these misrepresentations could have been discovered by him, by diligent enquiry, and examination, to have been false.

It was in proof, that the land was situate within six miles of the residence of Arrington—that Evans was his son-in-

law, and that they had both removed to this State from North-Carolina, a few months previous to the contract.

To the charges given, and to those refused, the defendant, Arrington, excepted, and now assigns for error.

THORNTON, with whom was R. H. SMITH, for plaintiff in error.—To show that the charge given was erroneous, they cited 1 Story's Equity, 222-3 ; 4 id. 320 ; Chitty on Con. 226-7—which authorities, they insisted, applied to all the charges which the Court refused, except the first ; as to which they cited 1 Story's Eq. § 208 ; 9 Porter, 678 ; 1 Ves. sr. 95.

J. B. CLARK and MURPHY, contra.—The principal has not rescinded the contract ; it is therefore binding on him, whether fraudulent or not.   (5 Ala. 606 ; 1 id. 622 ; 5 id. 551.)

As to the extent and liability of a surety, they cited 4 Munford, 324 ; Pirtle's Dig. 430 ; Pothier on Ob. 203, top page.

There is no fraud proved.   The representations were matters of opinion merely, as to which the purchaser must judge for himself.  (2 Ala. 635 ; 5 id. 596.)

ORMOND, J.—The contract of suretyship has been defined to be, a contract whereby one person engages to be answerable for the debt, default, or miscarriage of another.   It is an obligation accessorial to that of the principal debtor : the debt is due from the principal, and the surety is merely a guarantor for its payment.   [1 Evans' Poth. on Ob. art. 5, 228.]   A corallary from this definition, is, that it is of the essence of such a contract, that there be a valid obligation of the principal debtor.   And as upon a recovery by the creditor against the surety, he could re-imburse himself by a suit against his principal, it also results necessarily, that the surety may, in general, make any defence which his principal could make. So, on the other hand, it necessarily follows, that a defence which the principal could not make, or which, by his conduct, he had precluded himself from making, or had waived, can not be made by the surety.

A moment's reflection will show the propriety of this conclusion.   If the principal could abide by the contract, and the surety repudiate it, the strange result would be produced, that

the principal would retain the fruits of the contract, whilst the surety would avoid the performance of his obligation, on the ground of its invalidity, in direct opposition to the acts of his principal, admitting that the contract was valid. This would be to destroy the accessorial character of the contract of suretyship, without imposing on the surety the obligations of a principal debtor.

This precise point, was decided by the Court of Appeals of Virginia, in Ross v. Woodville; 4 Mun. 324, where it was held, that when a purchaser of land had given bond and security for the purchase money, and failed to obtain a good title, the surety, when sued, could not set set up the failure to make title, his principal having waived it.

In accordance with this rule, are those cases in which the surety is held to be conclnded by the act of his principal. Townsend & Gordon v. Everett, 4 Ala. 611, is one in which this principle is enforced, and illustrated, and many other similar cases are to be found in our books of Reports.

To apply these principles to this case. It does not appear from the record, that Evans, the principal, denies the validity of the contract for the land and slaves, &c., and so far as we are informed by the record, the contract, as to him, is valid. Indeed, the judgment by default, is an admission, of record, of his liability ; such being the case, the surety cannot impeach it. No matter how fraudulent it may have been, as the principal has acquiesced in it, it is binding on him, and is therefore binding on the surety. Doubtless, if the principal debtor, and the creditor were to collude, to fix a liability on the surety, he could obtain relief against the fraud ; but that is not pretended, and it is simply upon this point of the case, an effort of a surety, to invalidate a contract for fraud, which his principal has acquiesced in, and admits to be binding on him. Upon this point of the case, the Court correctly charged the jury, and also correctly refused the first charge moved for by the defendant's counsel, which assumes that the principal debtor might abide by the contract, and yet the surety repudiate it.

The other question presented upon the record, is one of more difficulty. We have seen that although a contract may be voidable by the principal debtor, yet if he declines to

avoid it, and submits to perform it as a valid contract, the surety is bound by his act. There may, however, be a fraud upon the surety, as such, which will avoid the contract as to him, though it be binding on his principal. Mr. Justice Story, in the 1st vol. of his Com. on Equity, § 324, and which is mainly relied on by the defendant's counsel, thus states the doctrine : "The contract of suretyship imports entire good faith, and confidence, between the parties in regard to the whole transaction. Any concealment of material facts, or any express or implied misrepresentation of such facts, or any undue advantage taken of the surety by the creditor, either by surprise, or by withholding proper information, will undoubtedly furnish a sufficient ground to invalidate the contract." As to the nature of the facts, the concealment of which would amount to a fraud, the same author is more explicit in a previous part of the same work, § 215. It must, to constitute a fraud, be the concealment of a fact, which the creditor is bound to disclose. Thus, he puts the case of a merchant cheated by his clerk, whom he retains in his employ as if he were trust-worthy, and permits one, acting under this natural presumption, to become a surety for the good behavior of the clerk. The case of insurance, and the necessity for disclosing to the underwriter all material facts, affords another illustration. These are cases of fraudulent concealment, because there was an implied obligation on the creditor to disclose the facts, which so greatly increased the risk of the surety. But certainly no such transcendental principle has ever obtained in courts of justice, that a vendor about to sell an estate, was bound to expostulate with the proffered surety, and expose to him the risk he was about to run, from the fact. that he was about to become surety for a man of doubtful credit, or that the vendee was about to give more for the property, than it would probably again sell for! However desirable it may be, that such a sublimated morality should pervade all contracts, it is too etherial to come within the grasp of the law. In Van Arsdale & Co. v. Howard, [5 Ala. Rep. 600,] this question was considered, and there held, that the omission of an agent of the creditor, to disclose to a surety, that he, the agent, had obtained a mortgage on the goods of the debtor, was not a fraudulent concealment.

Evans and Arrington v. Keeland.

It appears then, we think very conclusively, that there was no fraudulent concealment by the vendor, of any fact which he was bound to disclose. Was there any reqresentation of facts by the vendor, which being false, would be a fraud upon the surety?

It appears that the vendor, and vendee, having bargained for the land, are found at the house of Arrington, the father-in-law of the vendee, to consummate the contract by executing the necessary writings. The father-in-law being called on to sign the notes as surety, remarked, "that he did not like to put his name to such papers, unless he had seen the land, and knew more about its quality." To this the vendor replied, that he need feel no apprehension in signing the papers, and that the land was as good, or better than two other tracts which were designated, and with which the parties were acquainted. He further added, that there was a comfortable dwelling-house, good smoke-house, &c., &c.

To make these representations, conceding them to be false, a fraud which would avoid the contract of the surety, they must be such, as that fraud may be predicated of them. And further, must have been made with the intention of inducing the person, to whom they were addressed, to become surety.

The representations here made, are not, in any just sense, facts, but in whatever form expressed, are really opinions, which the person uttering them professes to entertain. His declaration, that the land was as good, or better, than that of the other persons mentioned, is nothing more than the institution of a comparison between the two. He may have honestly entertained this opinion, though incorrect; the establishment of the fact, therefore, that his judgment was erroneous, does not prove that he intended to deceive. The same remarks apply to the "comfortable dwelling-house, good orchard, &c.", which it is now supposed, existed only in his imagination. These are relative terms, having no fixed, or ascertained meaning, but regulated by some standard, which the speaker has erected in his own mind, and having no tangible existence, with which it can be compared, and its truth or falsehood demonstrated, such representations are not of matters of fact, but are opinions merely, and are so considered by every one, in the ordinary transactions of life. There may

be exceptions to this rule, in cases where the property is remote, and there being no means of access, or examination, such representations though in the form of opinions, would be in effect a warranty.   Such is not the case here.   The property was situated in the same neighborhood, and as the contrary is not shewn, it is fair to presume the vendee had seen it, and was satisfied with it; but whether he had, or had not, it could make no difference as to him, as was held by this Court, when this case was here between the vendor and vendee.   [5 Ala. Rep. 561.]

Nor, in our opinion, is this such a misrepresentation, as will avoid the contract as to the surety.   A representation to have that effect, must be a false assertion of a fact, calculated to mislead him—the knowledge of the truth of which, would have prevented his being surety.   This results necessarily from the nature of his undertaking, which is accessorial to the direct obligation of the principal.   The surety in this case, is not the purchaser of the land, nor invested with the rights of one ; he is merely a guarantor, that the vendee will perform his contract with the vendor, and a false assertion, which would authorize the vendee to avoid the contract, would not necessarily be available to the surety, and certainly could not be taken advantage of by him, if the principal affirmed the contract.   This is shown by the case cited from 4th Munford, 324, and those determined by this Court.

It is, therefore, very clear, that the representation to avoid the contract as to the surety, must be a fraud on him as such, and in that character.   For example, if the creditor should falsely represent the debtor as solvent, when he was not so, and thus by inducing the surety to believe there was but little if any risk, procure his signature, it would be a fraud upon him as surety.   So also, it may be, that a false assertion, that the property sold, would command the price given for it, made with the view of inducing one to become surety for the purchase money, would also be a fraud which would avoid the contract; but to have that effect, it must at least be an assertion of the fact, and not an expression of an opinion, that such would be the result, as that would at once put the party on his guard, if he relied on the property as a means of

reimbursement. The cases put by Judge Story, to illustrate the doctrine of fraudulent concealment, are all of this class. Indeed, the whole difficulty in this case has arisen, from not considering the legal effect of the contract of suretyship, and confounding it with the contract of his principal, to which his is a mere accessory.

It would be a strange anomaly, if a representation of the quality of the property sold, which the vendee could not avail himself of, should be sufficient to enable his surety to defeat the contract. If a fraud is committed on the vendee, he must place the vendor in *statu quo*, by returning the property, or he will not be permitted to take advantage of it. Not so when a fraud is practiced on one, to induce him to become surety. His rights as surety, are distinct from the contract of sale, and as he has not the rights of a vendee, neither has he the disability. This is, in our opinion, conclusive to show, that an opinion of the value, or quality of the article sold, expressed by the vendor, cannot be a fraud upon the surety, as such. It is, therefore, unnecessary to enquire into the intent, with with which these representations were made.

Comparing this exposition of the law, with the charge given, and the charges refused, it will be seen that there is no error, of which the surety can complain. Indeed, in one respect, the charge is too favorable to him, as it proceeds upon the hypothesis, that the surety was invested with the rights of a vendee. Some portions of the charge are, doubtless, open to criticism ; as where it is said "that the vendor had a right to make any representations he might see proper as to the quality of the property, and if the surety chose to rely on them, it would not avoid his liability, because it was his duty to have examined," &c. Again : "that if the surety could have examined for himself the property sold to his principal, he should not have relied on the representations of the vendor, who had a right to speak of the quality of the property as he thought proper, as matter of opinion." Further, " that it was the duty of Arrington to examine for himself, and that no representation made by the vendor to him, to induce him to sign as surety, would constitute a fraud of which he could take advantage, if these representations could, by diligent enquiry, have been discovered to be false."

Evans and Arrington v. Keeland.

These charges are evidently framed upon the supposition, that the surety had the same rights as the vendee, and it must be conceded, are incautiously worded, although in the commencement of the charge, the Court had drawn the distinction between a fraud which would vacate the contract of sale, and one which avoided the contract of the surety, though the sale was binding on the vendee. But conceding that, the charges mentioned are too broad, and indefensible as abstract legal principles, it is impossible the surety could have been injured, as the Court would have been justified in going far beyond them, and to have instructed the jury, that such representations were not not, in law, a fraud upon the surety. It therefore appears, that there is no error in the record prejudicial to the plaintiff in error, and the judgment must be affirmed.

COLLIER, C. J.—Where the vendor of property intentionally conceals facts which he ought to disclose, or falsely represent them to a third person, for the purpose of inducing him to become the surety of the purchaser, he is guilty of a fraud ; and if a party thus deceived as to the real state of the facts, enter into the contract of suretyship, no obligation will arise therefrom, but the engagement is a nullity. [Theobald on Princ. and Surety, 147 ; 1 Story's Eq. 222.]

In Pitts v. Cottingham, [9 Porter's Rep. 675,] we said, "It is not true, however, that equity will deny relief against false representations, though made with respect to mere value ; and the cases are numerous in which damages at law have been recovered, and contracts rescinded in courts of equity, on this ground alone. [Burton v. Cooper, 3 Atk. R. 383 ; Duke of Norfolk v. Worthy, 1 Camp. Rep. 337 ; Fenton v. Brown, 14 Ves. Rep. 144.] There is some difficulty in defining with exactness any rule which will embrace all the cases in which a false representation of value will entitle the purchaser to relief ; but it seems clear, that it will not be denied, *where there is a positive representation, essentially material to the subject in question, and which at the same time, is false in fact;* provided the application for relief is made with due diligence. [Lowndes v. Lane, 2 Cox Rep. 363 ; Sherwood v. Salmon, 5 Day's Rep. 439.]" In the case

cited, we supposed that the false representation as to value, furnished a sufficient ground to relieve the purchaser, and was strengthened by the fact that he placed entire and implicit reliance on the assertions of the vendor—having no means of ascertaining their falsity by an inspection of the property before the sale.

In Camp v. Camp, [2 Ala. Rep. 632,] it was contended, that the law will not assist a purchaser who supinely rests on the opinions of those with whom he is dealing ; but this Court said, "The true meaning of this rule is, that the purchaser must judge for himself, as to all those matters which lie in opinion merely ; as for example as to the value, &c. ; assertions upon these matters by the vendor should pass for nothing," &c. *Further*, we said, that "the law is not so destitute of morality" as "not to forbid any intentional concealment, or suppression of the material facts necessary to be known, and to which the other has not equal access or means of ascertaining." That although the law requires ordinary care and diligence on the part of the purchaser, to ascertain the quality of the article he is about to buy, "it does not exact *extraordinary* diligence, but as to those facts which by ordinary diligence could not be ascertained, it permits a reliance on the assertions of the party, who from his opportunities, has the means of knowledge." While this decision maintains that the vendee cannot be relieved from his purchase for any mistaken opinion expressed by the vendor as to the value or quality of the property, it holds that there are assertions of the seller, in which the purchaser may confide, and if false, may claim a rescission of the contract. But does the law make the same requisition of the surety as to diligence, as it does of his principal, the vendee ? May he not repose a more enlarged confidence in the representations of the vendor ?

The facts of the present case, so far as I deem it material to notice them, are substantially these : The lands sold by Bolling to Evans, were situate six miles from Arrington's residence ; Evans was the son-in-law of Arrington, and both of them had removed from North-Carolina in January preceding the sale. The contract was entered into at Arrington's house, and he was called in, either by the vendor or vendee, " to go security for the purchase money ;" whereupon he remark-

ed that " he did not like to put his name to such papers, un-
less he had seen the land and knew more about its quality."
The vendor then said, " Arrington need feel no apprehen-
sions in signing the papers, and that the land was as good
or better" than a tract they had seen the day before : *fur-
ther*, that there was " a fine garden, good peach orchard, and
fine improvements, a comfortable dwelling-house," &c. ;
and also, that one of the slaves sold with the land, was a
good seamstress. The truth of the case was, that the land
purchased by Evans was inferior in quality and value to the
land to which Bolling compared it, and was itself of an infe-
rior quality ; *further*, the orchard, buildings and improve-
ments did not at all equal the representations of the vendor,
to Arrington, but were much less valuable than he stated
them to be : *besides*, the slave, instead of being a good seams-
tress, knew nothing about sewing.

Now, it will be remarked, that it does not appear whether
the vendor or vendee called upon Arrington to become the
surety of the latter, and in a prayer for instructions as to the
effect of the misrepresentations of the vendor, it may be sup-
posed to be either the one or the other. Let it be assumed
then, that Arrington was called by the vendor to become the
surety of the purchaser, that he objected, or if you please he-
sitated, and to induce him to sign the notes by removing his
objections, the vendor made the statements which are set
forth above, if they are false, did the surety become bound by
lending his name. It was clearly competent for the surety,
under the circumstances of the present case, to have appeal-
ed to the vendor, for information as to the value of the land,
&c., its improvements, locality, &c. ; and if the latter under-
took to impart it, he should have acted with all honesty and
faithfulness ; if he did not thus act, but influenced the surety
by a representation that was essentially false, the liability of
the latter never attached, and he might defend himself at law.
I do not pretend to say that the law would not be the same
if the *purchaser* had called upon Arrington to sign his notes,
but I choose to consider the case upon the other hypothesis,
because such a view is entirely consistent with the facts ;
and presents the injustice of denying the defence in a stronger
point of view.

Evans and Arrington v. Keeland.

It is not necessary that I should controvert any thing that was said in Pitts v. Cottingham, and Camp v. Camp: it may be admitted that these decisions are just exponents of the law as applied to vendor and vendee. In such contracts it may be conceded that the vendor may make such representations as to the value of the land he is selling, or express such an opinion as to its quality as he may be inclined, and if the vendee has an opportunity of examining the land himself he shall not be allowed to set up the falsity of the statements as a ground for the rescission of the contract. But the case at bar, is in my judgment, entirely dissimilar, both in fact and principle, from that supposed. Here it was a matter for the consideration of the jury, whether Arrington was not called on by the vendor to be the vendee's surety, and whether he was not induced by the representations of the vendor, to sign the notes. If he was thus induced, and these representations were made with the knowledge or belief that they were untrue, or without caring or stopping to inquire whether they were true or not, then the jury might very well have inferred that they were made with the intention to defraud; and under these circumstances, I cannot doubt, that no obligation would have attached to the undertaking of Arrington. Whether the statements of Bolling were matters of opinion or affirmations, if intended to deceive, and unfounded in themselves, is wholly immaterial.

The law should have been stated to the jury as I have shown the facts required, instead of saying that "the vendor had a right to make any representations he might see proper as to the quality of the property, and if the security chose to rely on them, it would not avoid his liability, because it was Arrington's duty to have examined into the matter himself." *Further,* "that no representation made by the vendor to Arrington, to induce him to sign as security, would constitute a fraud of which he could take advantage, if those misrepresentations could have been discovered by Arrington by diligent inquiry and examination to have been false.

The result of this view is, that the judgment should be reversed, and the cause remanded. In the legal principles stated in the opinion of my brethren, so far as they are not op-

posed to what I have said, I in general concur; perhaps ap-·· prove them in *toto*.

ORMOND, J.—This cause has been again argued, and we have given to it the fullest consideration. The effect of this has been to confirm us the more fully in the judgment heretofore pronounced, as to the effect in law, of the declarations imputed to Bolling, the vendor. The only matter about which we entertained a doubt, was, whether as the charge was wrong abstractly considered, the defendant may not have been prejudiced by it, as the bill of exceptions does not profess to set out all the facts. Such could not however be the case, as the charges of the Court are predicated upon the testimony set out in the bill of exceptions. The language of the bill of exceptions, is, "upon this state of facts the Court charged the jury," and if other testimony existed, requiring the law to be charged differently, it should have been set out, and a charge asked upon it.

It is the established law of this Court, settled by numerous adjudications, that a cause will not be reversed, though the Court may have committed an error in its charge, if it could not prejudice the party against whom it was pronounced. [Porter v. Nash, 1 Ala. 452; Randolph v. Carlton, 8 Ala. 607; McBride and Wife v. Thompson, ib. 650.]

The case of Peden v. Moore, 1 S. & P. 81, settles the principle, that when the Court gives a wrong charge to the jury, this Court will reverse, although the evidence is not set out, so as to show that it is not abstract. This case does not come within the influence of that rule, because, here the testimony is set out, and the charge is predicated upon it, so as to enable this Court to say precisely, what influence it was calculated to exert upon the jury. When the Court said, that " the vendor had a right to make any representations he might see proper, as to the quality of the property, and if the surety chose to rely upon them, it would not avoid his liability, because he ought to have examined," &c., it is evident the Court is confounding the case of the vendee, with that of his surety; and even as to the former, it must be admitted the law is laid down too broadly. But how could this prejudice the party complaining of it. The Court might have

told the jury, that these representations were matters of opinion, and whether correct or incorrect, could have no influence on their verdict. Such being the case, it is self-evident, that the charge could not have prejudiced the surety.

Again—When the Court say to the jury, that no representations made by the vendor to the surety, to induce him to sign as surety, would constitute a fraud of which he could take advantage, if such representations could, by diligent enquiry, have been ascertained to be false, he is again confounding the surety with the vendee, and even as to the latter, charging the law incorrectly. But when the Court say the vendor could make no representation of which the surety could take advantage, it must be understood in reference to the testimony before the jury, or there was no testimony, and it was abstract. In neither, aspect, could it possibly prejudice the surety. In truth, the charge as given, was more favorable to the surety in one aspect, than the defendant could have asked for, as it authorized the jury to find for him, if by diligent enquiry he could not have ascertained the representations to be false.

This may be a hard case upon the surety, but we cannot bend the law to suit particular cases; and in our deliberate judgment, if such opinions as are here expressed, could be left to the jury, as evidence from which they might infer a fraudulent intent, so as to absolve the surety, when the same opinions, expressed in the same manner, would not vacate the contract of his principal, it would virtually put an end to the contract of suretyship.

The judgment heretofore pronounced by the majority of the Court, must remain as the judgment of the Court.

COLLIER, C. J.—I cannot seriously doubt that the law in this case has been incorrectly ruled, and upon points not abstract; consequently, I adhere to the dissenting opinion heretofore pronounced by me.