## CITY OF CHICAGO

*v.*

## DAVID A. GAGE *et al.*

*Filed at Ottawa March Term, 1880—Rehearing denied September Term, 1880.*

1. SIGNING BONDS IN BLANK—*implied authority to fill the blanks.* A party executing a bond knowing·that there are blanks in it to be filled up by inserting particular names or things necessary to make it a perfect instrument, must be considered as agreeing that the blanks may be thus filled after he has executed the bond. If the party signing the paper shall insert in the appropriate places the amount of the penalty, or the names of the sureties, or any other thing he may deem of importance as affecting his interest, he may in that way protect himself against being bound otherwise than as he shall thus specify. But if, relying upon the good faith of the principal, the surety shall permit him to have possession of a bond signed in blank, the surety will have clothed the principal with an apparent authority to fill up the blanks at his discretion, in any appropriate manner consistent with the nature of the obligation proposed to be given, so that, as against the obligee receiving the bond without notice, or negligence, and in good faith, the surety will be estopped to allege that he executed the paper with a reservation or upon a condition in respect of the filling of such blanks, and this, whether the blanks to be filled have reference to the penalty of the bond, the names of co-sureties, or other thing.

2. The apparent authority of the principal in an obligation which has been executed in blank by others as sureties, to fill in the blanks in an appropriate manner, may be implied from the facts and circumstances attending the transaction, and may be shown by parol;—and this rule applies to instruments under seal as well as to those which are not under seal.

3. According to the ancient doctrine of the common law, a parol authority was not adequate to authorize an alteration or addition to a sealed instrument,—the authority must have been of equal dignity with the instrument itself;—so that a paper signed and sealed in blank, even with verbal authority to fill the blanks, which should afterwards be done, was void as to the parties so signing and sealing, unless they afterwards delivered, or acknowledged or adopted it. Upon this doctrine was based the case of *The People* v. *Organ,* 27 Ill. 29. But this old technical rule has yielded in operation, in this respect, at least, of filling blanks in official bonds, to the application of the more modern doctrine of estoppel *in pais.*

4. As to the name of the office in respect to which a bond is proposed to be given, and which was in blank in the paper when signed by the sureties,— it might be rendered certain by reading the blank bond in the light of sur-

38—95 ILL.

rounding circumstances, which is always admissible to ascertain the meaning of a written instrument. In this case the blank bond itself recited that the office was one "in the city of Chicago," to which the "above bounden" had been elected or appointed; and it was to the office of treasurer of that city which the "above bounden" party, who had already signed the bond, had just been elected. Thus, there could be no uncertainty in the minds of the sureties what office was intended.

5. Furthermore, by the law the amount of the penalty in the city treasurer's bond was to be determined upon by the common council, to be fixed by them in such amount, not less than a given sum, that they should deem the safety of the city required. This provision of law was deemed to strengthen the inference of an implied authority to fill the blank for the penal sum,—it not being one to be fixed by agreement of parties, as in the case of ordinary bonds.

6. SAME—*of notice to the obligee as to sureties signing upon condition.* The mere fact that the obligee in a bond has knowledge at the time he receives it that there were blanks in the instrument which had been filled subsequent to the signing by the sureties, and in their absence, will not operate to affect the obligee with notice of any secret conditions upon which the sureties may have signed the bond.

7. It is not every defect on the face of a bond which has been signed in blank, which will operate as notice to the obligee, or put him upon inquiry in respect to conditions upon which the sureties may have signed it. The imperfection upon the face of the bond which is to have such effect, must be of such a character that it points towards, indicates, and excites suspicion of, the particular matter of defence alleged against the instrument, and, as an ordinarily prudent man, to put the obligee to make inquiry as to the existence of the very thing which is set up in defeat of the instrument.

8. But in the case of an official bond, in which the blank had reference to the penal sum, and that penal sum was, by law to be fixed by the municipal authority, who were to approve and receive the bond, the fact that the obligees knew that the instrument, at the time it was signed, was in blank in respect to the penalty, would not operate to put them upon inquiry to learn whether the sureties had signed the paper upon condition that the penal sum should not exceed a certain amount.

9. In such case, knowledge on the part of the obligees of the unfilled blank for the penalty would be but knowledge of the apparent implied authority with which the law clothes the principal obligor to fill it, and consequently could afford no ground of suspicion of any want of authority, nor indicate any bad faith on the part of the obligees in receiving the bond with such knowledge.

10. OFFICIAL BONDS—*within what time to be filed—whether limitation in the law is mandatory, or merely directory.* The charter of a city provided that all

city officers who were required to give bonds for faithful performance of official duties, should "file their bonds with the city clerk within fifteen days after their election," etc. The charter further provided that when bonds should not be filed with the city clerk within fifteen days after the official canvassing of the votes, "the person so in default should be deemed to have refused said office, and the same should be filled by appointment as in other cases." And in case a bond so filed should not be approved, and a satisfactory bond should not be filed within fifteen days after such disapproval, the person so in default should "be deemed to have refused said office, and the same should be filled as above provided." And further,—the charter made it "the duty of the clerk to notify all persons elected to office, of their election, and unless such persons should respectively qualify within fifteen days thereafter the office should become vacant." It was *held,* these provisions in respect to the time within which the official bonds were required to be filed, were not mandatory, but merely directory. The municipal authorities were empowered, in their discretion, to declare a vacancy, or to waive the default as to the mere time of filing bond, and to accept. and approve it when afterwards filed. The mere default in that regard would not, of itself, operate to vacate the office.

11. So, in this case, a person who had been elected to the office of treasurer of such city, lodged with the city clerk, within the fifteen days limited in the charter, a form of a bond, signed by himself and his sureties, but in blank as to the names of the obligors, the penalty, the date of the instrument, the name of the office, and the time of the election, and this paper remained in the hands of the clerk until after the expiration of the fifteen days, and was then withdrawn by the principal obligor, the blanks filled by his direction, and the bond then approved and accepted by the city council as the official bond of the treasurer. It was *held,* it was entirely competent for the city council to waive the default as to the time of filing the bond, which was but a ground of forfeiture, not a forfeiture of itself. And so far as concerned the liability of the sureties on the bond, the apparent implied authority with which they had clothed their principal to make use of and deliver it as his official bond, by signing and sealing the same and leaving it with him, was a continuing authority, until some step should be taken by them towards its revocation. They would be liable upon the bond to the same extent as if it had been filed within the time limited by the charter.

12. Where the condition of the bond, in such case, recited that the principal obligor was to hold the office "for the period of two years, and until his successor should be duly elected and qualified, *or until said office should be otherwise legally vacated,*" these latter words would not be regarded as having reference to the contingency of not filing the bond within the time limited by the charter, and that if not filed within that time the sureties were not to be liable. The words would be deemed to refer to something to take place after the delivery and acceptance of the bond, and the meaning of the bond was

construed to be that the sureties guaranteed that the officer elect should execute his official duties during his full term as fixed by law, unless, after the execution and delivery of the bond, the office should be legally vacated.

13. SAME—*where city treasurer is his own successor—whether balances on hand come to him as such successor—liability of sureties.* Where a city treasurer is elected as his own successor, as respects balances in his hands at the close of his first term, if he entered them in his treasury books as actually come to his hands from his predecessor, and continued from time to time to return and report the same as in his hands, both he and his sureties would be concluded, in an action on his bond for the second term, from denying that these balances did actually come to his hands as treasurer. It was his duty, upon his second term, as incoming treasurer, to receive the treasury balances from his predecessor, and the law would transfer any balances on hand to his second term.

14. SAME—*evidence as to amount in hands of principal—sureties concluded by entries of principal.* Where the law specially requires a city treasurer to make and keep his accounts, and to make statements thereof at specified periods, under oath, and to make certain monthly and annual reports, also under oath, in respect to his receipts and disbursements, and balances on hand, these acts being within his official duties, for the performance of which the conditions in his official bond provide, in an action on such bond the sureties will be concluded from showing that the amount so appearing as treasury balances in the hands of their principal was not actually in the treasury at the time.

15. Nor would it be competent in such case for the sureties to prove that a part of the balance shown by the treasury books, reports, etc., to have been on hand at a certain time, was actually loaned out for the benefit of the city, because there being no authority for the treasurer so to employ the public money, the fact, if proven, would simply show a breach of the bond.

16. OFFICER—*making profit on public funds.* Where a treasurer of public funds receives interest from the use or loaning of such funds, such interest will not belong to the officer as the perquisites of his office.

APPEAL from the Appellate Court for the First District.

An action of debt was brought in the circuit court of Cook county, by the city of Chicago, against David A. Gage, late treasurer of the city of Chicago, and John B. Sherman and others as sureties upon what was alleged to be the official bond of said Gage, to recover a sum of money which it was alleged he had refused to pay over to his successor in office.

Pleas of *non est factum* were filed by all of the defendants and verified by a part of the sureties. Issues were formed thereon, and upon the breaches assigned, by proper pleas, and upon the issues thus formed a trial was had in the circuit court resulting in a verdict against the defendants for $1,000,000 debt, the penalty of the bond, and $507,703.58 damages, upon which judgment was rendered. The defendants took the case to the Appellate Court for the First District, where the judgment was reversed, and the city appealed from the judgment of the Appellate Court to this court.

The facts upon which the questions of law arise are as follows:

That on the 7th day of November, 1869, David A. Gage was duly elected treasurer of the city of Chicago; that he duly qualified, gave the bonds required by law, and entered upon and discharged the duties of said office for the space of two years, and on the 7th day of November, 1871, he was duly elected his own successor in said office; that all the records in the treasurer's and comptroller's offices of the city of Chicago were destroyed by fire on the 8th and 9th of October, 1871; that on the 13th of February, 1872, Gage reported to the comptroller that there was in the treasury of the city, on the said 9th day of October, 1871, the sum of $645,749.48 cash, which sum was adopted as a basis of future monthly reports required by law to be made by the said treasurer, adding to said sum his receipts of revenue from all sources, and deducting all disbursements made by him on account of the said city. From these reports, made monthly, under oath, it was made to appear that on the 16th day of December, 1873, the date of the expiration of the second term of office, there was in Gage's hands, as treasurer of said city, the sum of $965,780.81, of which sum Gage paid over to his successor, the late Daniel O'Hara, the sum of $458,077.23, leaving a deficit unaccounted for of $507,703.58; that this action was brought in the circuit court to recover the amount of this deficit against said Gage and the other defendants, on

what purported to be his official bond, for the second term of his office, to which he was elected on the 7th of November, 1871.

That the instrument sued upon was signed by the parties claimed to be sureties whilst it was a blank form.

That the following is a copy of said instrument as it now appears, the printed words of the same, as it was when signed, being in Roman letters, and the words inserted thereafter to fill up the blanks, being in italic:

"Official Bond.—Know all men by these presents, that we, *David A. Gage, William F. Tucker, Albert Crosby, John B. Sherman, James H. McVicker, John A. Rice, Nathaniel P. Wilder and George W. Gage,* of the county of Cook, and State of Illinois, are held and firmly bound unto the city of Chicago, in the penal sum of *one million* dollars, lawful money of the United States, for the payment of which sum of money well and truly to be made, we bind ourselves, our heirs, executors and administrators, jointly and severally, firmly by these presents.

"Sealed with our seals, and dated this *eleventh* day of *December*, A. D. 1871.

"The condition of the above obligation is such, that whereas the above bounden, *David A. Gage,* was, on the *seventh* day of *November*, 1871, *elected* to the office of *treasurer* in and for the city of Chicago, to hold said office for the period of *two* years, and until his successor shall be duly elected and qualified, or until said office shall be otherwise legally vacated:

"Now, therefore, if the said *David A. Gage* shall well and faithfully perform and discharge the duties of said office, as prescribed and required by law, and the orders and ordinances of said city of *Chicago*, and shall account for and pay over all moneys received by him as such *treasurer*, in accordance with law, and in accordance with orders or ordinances heretofore passed, or hereafter to be passed, by the common council of said city, in conformity with law, and deliver all

books, papers, and all other property belonging to said city, to his successor in office, then this obligation to be void, otherwise to be and remain in full force and effect.

|  |  |  |
|---|---|---|
|  | DAVID A. GAGE, | [Seal.] |
| *One Dollar Revenue Stamp.* | WM. F. TUCKER, | [Seal.] |
| *December 11, 1871.* | ALBERT CROSBY, | [Seal.] |
| *D. A. Gage.* | JOHN B. SHERMAN, | [Seal.] |
|  | J. H. McVICKER, | [Seal.] |
|  | JOHN A. RICE, | [Seal.] |
|  | N. P. WILDER, | [Seal.] |
|  | GEORGE W. GAGE, | [Seal.] |

"Signed, sealed and delivered in presence of

———— ————, City Clerk.

Approved ——— 187 .

O. K. M. F. T."

INDORSEMENT: "Document No. 102. Official bond of *David A. Gage, city treasurer,* approved by the common council *January* 8, 1872, *C. T. Hotchkiss,* clerk. Presented to the mayor for his approval *January* 10, 1871, *C. T. Hotchkiss,* clerk. Approved *January* 10, 1871, *Joseph Medill,* mayor. *Recorded book* 2, *page* 31, *official bonds."*

That some time in November, 1871, about the 15th day of said month, Robert Clark, Gage's son-in-law, at the instance of said Gage, took this paper, then blank, and without any writing upon it except the signature of Gage, and went to the Union Stock Yards to secure the names of Mr. Tucker and Mr. Sherman, as sureties; that upon meeting Tucker he made known to him his business, and requested him to sign the paper, and procure Sherman to do so. Tucker inquired of Clark what was to be the amount of the bond and who were to sign it; to which inquiry Clark replied that the amount had not yet been fixed, but that Tucker could find out the amount, which was yet to be fixed, and also the names that should be on it when he qualified. That he would have to go down and qualify to the bond. That Tucker signed it under these circumstances, and procured Sherman to do so.

Upon presenting the paper to Sherman, Sherman inquired of Tucker what was to be the penalty of the bond, and Tucker reported to him the representations made by Clark; Sherman, at the same time, saying that he would not sign it at all if the penalty was to be over $250,000, and not then unless the co-sureties were satisfactory to him, but whether he would stand on the bond as surety or not, he would reserve until he had gone down to acknowledge the bond. That Sherman signed the paper under these circumstances; that neither Sherman nor Tucker were ever called upon to acknowledge the bond, and never did acknowledge it, and never saw it again until on the trial of the cause in said circuit court; and never authorized any one to fill up the bond, and never ratified or approved the bond after it was filled up.

That the canvass of the votes cast at the city election on November 7, 1871, was made on the 20th day of November, 1871; that on the 27th of the same month, Gage lodged with C. T. Hotchkiss, city clerk, at his office in the city of Chicago, the paper sued upon in this case, signed by all the parties whose names appear subscribed thereto, but with all the blanks of the original form still unfilled. That the paper remained with the said city clerk in that condition until the 11th day of December following, which was five days after the expiration of the time provided for the filing of his official bond as limited by section 25 of chapter 2 of the charter of the city of Chicago, then in force, which section is as follows:

"All city officers who are required by the provisions of this act, or by any legal ordinance passed by the common council, to give bonds for the faithful performance of their official duty, shall file their bonds with the city clerk within fifteen days after their election or appointment, and he shall record them, when approved, in a book kept for that purpose."

"When bonds are not filed with the city clerk within fifteen days after the votes shall have been officially canvassed, or after the appointment shall have been made, the person so

in default shall be deemed to have refused said office, and the same shall be filled by appointment, as in other cases."

"If, in any case, any official bonds so filed shall not be approved, the officer filing the same shall file a new and satisfactory bond within fifteen days after such disapproval; and in case of a failure so to do, he shall be deemed to have refused said office, and the same shall be filled as above provided."

Section 27, chapter 2, of the charter provides that "it shall be the duty of the clerk to notify all persons elected or appointed to office, of their election or appointment, and unless such persons shall respectively qualify within fifteen days thereafter, the offices shall become vacant."

That whilst said paper remained in possession of said city clerk as aforesaid, Mr. C. C. P. Holden, the presiding officer of the former common council of the city, which held its last meeting on November 27 or 28, 1871, but was re-elected to this council, before its meeting and organization, had his attention called to it; that on the said 11th day of December, 1871, Gage went to the office of Hotchkiss, the city clerk, stating to him the amount of the required penalty (which Gage had previously obtained from the city comptroller) and requested Hotchkiss to fill up the blanks, and present it to the common council that evening. Hotchkiss declined to fill up the blanks, saying it belonged to the corporation counsel to do that. Hotchkiss, the city clerk, and Mr. Gage then went together to the office of the corporation counsel, taking said paper so signed in blank with them for the purpose of having the blanks therein properly filled up. That M. F. Tuley, at that time the corporation counsel, was not in his office, but Mr. Clyde was, who was an attorney at law, then in the employ of the city of Chicago in the legal department of said city, as assistant to the corporation counsel. Gage informed Clyde that the bond had been agreed upon for $1,000,000,— the bond was presented to Clyde, and he filled up the blanks. That subsequently said paper, the blanks being filled as

aforesaid, was returned to the city clerk from the office of the corporation counsel, with his initials thereon, indicating his approval of the same, and was on the 8th day of January, 1872, presented to and approved by the common council of the city of Chicago as the official bond of said Gage for the term of two years next succeeding his last election, as aforesaid.

Mr. FRANCIS ADAMS, and Mr. SIDNEY SMITH, for the appellant:

I. A person executing a bond, knowing that there are blanks in it to be filled up, necessary to make it a perfect instrument, must be considered as agreeing that the blanks may be thus filled after he has executed the bond, and this extends to the insertion in the body of the instrument of the names of the sureties, the penalty, etc. *Inhabitants of Berwick* v. *Huntress*, 53 Me. 89; *Crooker* v. *Smith*, 5 Mass. 537; *United States* v. *Nelson & Myers*, 2 Brock. 64; *Drury* v. *Foster*, 2 Wall. 24–28; *State* v. *Pepper et al.* 31 Ind. 76–85; *McCormick* v. *Bay City*, 23 Mich. 457; *State* v. *Young et al.* 23 Minn. 557; *State* v. *Berger*, 18 Serg. & R. 170; *Wiley* v. *Moore*, 17 id. 438; *Boardman* v. *Gore et al.* 1 Stewart, 517; *Wright* v. *Harris*, 31 Iowa, 272; *Ex parte Kerwin*, 8 Cowen, 118; *Texira* v. *Evans*, 1 Anstruther, 228; *Butler* v. *United States*, 21 Wall. 272; *Eagleton* v. *Gutteridge*, 11 M. & W. 465; *Bartlett* v. *Board of Education*, 59 Ill. 371, and cases there cited. See also, 1 Greenleaf on Evidence, Redfield's Ed. section 568 *a*, note 9.

When the blanks are filled without notice to the obligee, there can be no question as to the validity of the bond. *Dair* v. *United States*, 6 Wall. 1; *Smith* v. *Board of Supervisors*, 59 Ill. 412; *Bartlett* v. *Board of Education*, id. 371.

The authorities are clear that a specialty may be changed, or blanks therein properly filled, after signing and sealing, by express parol authority not in writing. *Commonwealth* v.

*Curry,* 2 Dana, 143; *Speake* v. *United States,* 9 Cranch, 28; *Drury* v. *Foster,* 2 Wall. 24–28.

In the case at bar, it is only in relation to the filling up of the amount of the penalty that any debatable question can arise. Filling the blanks with the names of the sureties signing, or the insertion of a date, could not vitiate. *Neil* v. *Morgan,* 28 Ill. 524; *Bills* v. *Stanton,* 69 id. 51.

II. Knowledge, actual or constructive, on the part of the obligee in a bond, that the instrument was signed and sealed by the sureties, with spaces left blank therein for the insertion of the penalty and the names of the sureties, and in that condition was delivered by the sureties to the principal, does not impose upon the obligee the duty of inquiring as to the circumstances under which the instrument was so signed, sealed and delivered to the principal. *State* v. *Young et al.* 23 Minn. 551.

The authorities cited *supra* establish the proposition that the sureties, by such signing, sealing and delivery to the principal, clothe the principal with apparent power to fill the blanks in such appropriate manner as may be necessary to make it a complete and perfect instrument. In other words, the possession of the instrument by the principal, thus signed and sealed by the sureties, is evidence of authority from the sureties to the principal to fill the blanks in an appropriate manner. Now, knowledge of the evidence of authority is certainly not a circumstance to induce suspicion as to the existence of the authority. A power of attorney is not of itself authority,—it is mere evidence of authority, so that in the case of an execution by the sureties to the principal of a power of attorney to fill the blanks, brought to the knowledge of the obligee, it would be just as logical to say that such evidence should create suspicion and induce inquiry, as any other evidence of authority.

It may be said that a power of attorney would be higher evidence of authority than the possession of the instrument by the principal, signed and sealed by the sureties as de-

scribed above, but this does not affect the question, which is, whether the knowledge of the obligee of evidence that the principal has authority from the sureties to fill the blanks appropriately, should induce doubt and inquiry as to the existence of the authority. In other words, whether evidence of the existence of authority should induce doubt of its existence,—whether evidence of a fact should phenominally, and contrary to the usual rule, induce disbelief instead of belief in the existence of the fact. The opinion of the court in the case of *Bartlett* v. *Board of Education,* 59 Ill. 364, is in harmony with the proposition under discussion. In that case there was no claim that the obligee had notice, actual or constructive, that the bond was signed in blank, and the court, in view of. this fact, say, p. 371 : "We feel justified in holding that when a bond was executed as this was, and .delivered to the obligee and accepted by him, without notice of any change of filling the blanks, it may be inferred that the sureties authorized the change, and the instrument will be binding."

It has been claimed that this language is authority for the position that notice to the obligee before delivery of the bond, that the blanks were filled after the sureties signed, would invalidate the bond. But, obviously, this is a question upon which the court did not pass, because it was not in the case, and the language cited does not support such position.

An analysis of the language will make this evident.

The court say that the *fact* that the sureties authorized the change may be inferred. Inferred from what? Clearly from preceding facts stated in the opinion of the court. What are those preceding facts? These, viz:

The bond was signed by the sureties with the blank as to the amount of the penalty unfilled. This blank was subsequently filled with the amount of the penalty by the principal in the bond, and the approving board had no knowledge of such signing in blank by the sureties.

Now, it is clear that the ignorance of the obligee of the signing in blank and subsequent filling up, is not a fact from which the authority of the sureties that such blanks might be so filled can be inferred. The existence of one fact can not be inferred from ignorance of another fact. The obligee had no knowledge that the bond was signed in blank, *ergo*, the sureties authorized the principal to fill the blanks. This might serve as an apt illustration of a *non sequitur*, but would hardly be assigned a place within the domain of reason. It must be evident that such ignorance could not create or contribute in any degree to the creation of authority from the sureties to the principal to fill the blanks. It could not, in the nature of things, form any element or constituent part of the basis for the inference of the fact of authority. Logically, therefore, it must be eliminated, leaving as the sole basis of the inference the fact that the sureties placed in the possession of the principal an official bond, signed by them, with the blank for the amount of the penalty unfilled.

III.   The office did not become vacant by reason of Gage's failure to file his bond within fifteen days after he was officially notified of his election.

Gage's right and title to this office were derived directly from the people by the election itself, which occurred on the seventh day of November, and not by the declaration and official notice of such election. *The People* v. *Brewster*, 15 Ill. 492, 501 ; *The People* v. *Cummings,* 25 id. 325–28 ; *Marbury* v. *Madison,* 1 Cranch, 49, 66.

His failure to file his bond within the fifteen days rendered his title voidable at the election of the mayor and the common council, so that they might have removed him by an appointment of his successor, as in the case of *Ross* v. *The People,* 78 Ill. 375.

That is to say, such failure did not of itself operate to vacate the office and oust Gage. Such is the reasonable construction, and such is the construction which courts have placed upon statutes in terms even stronger than this. *State*

v. *Toomer,* 7 Rich. (Law), 216–227 ; *Sproule* v. *Lawrence,* 33 Ala. 674. These cases are directly in point. See also, *Speake* v. *United States,* 9 Cranch, 28 ; *Rex* v. *Loxdale,* 1 Burr. 447 ; *Kearney* v. *Andrews,* 2 Stock. Ch. 70 ; *State* v. *Churchill,* 41 Mo. 41 ; *The People* v. *Haddock,* 12 Wend. 473, 480 ; *Hartford Insurance Co.* v. *Walsh,* 54 Ill. 164–8 ; *City of Chicago* v. *The People, etc.* 56 id. 334.

IV.  Gage is conclusively bound by his treasury record as to balances shown by said record to be in the treasury. *Hoyne* v. *Small,* 22 Me. 14 ; *Sheldon* v. *Payne,* 3 Selden, 453 ; *Townsend* v. *Olin,* 5 Wend. 207 ; *Matthews* v. *Dare,* 20 Md. 248 ; *Eastman* v. *Bennett,* 6 Wis. 232 ; *Board of Trustees* v. *Fenmore,* Cosc. (N. J. R.) 242 ; *Case* v. *Mills,* 7 Hurls. & Norm. 913.

If Gage is bound by the treasury record, so also are his sureties, the measure of responsibility on a bond being the same for the principal and the sureties.  *Rochester City Bank* v. *Elwood,* 21 N. Y. 90 ; *Belloni* v. *Freeman,* 63 id. 387–8 ; *Gilbert* v. *Isham,* 16 Conn. 525 ; *Patterson's Appeal,* 48 Penn. St. 345 ; *Patterson* v. *Guardians of the Poor, etc.* 38 Eng. L. and Eq. 440 ; *Evans* v. *Keeland,* 9 Ala. 42 ; *McCabe* v. *Raney,* 32 Ind. 309 ; *Willis* v. *Gallagher,* 46 Penn. St. 205 ; *United States* v. *Girault,* 11 How. 27 ; *Baker* v. *Preston et al.* 1 Gilmer, 235 ; *The State* v. *Grammer,* 29 Ind. 530 ; *Pinkstaff* v. *The People,* 59 Ill. 148 ; *Morley* v. *Town of Metamora,* 73 id. 394.

Mr. WIRT DEXTER, Messrs. LAWRENCE, CAMPBELL & LAWRENCE, and Mr. JOHN N. JEWETT, for the appellees, after an elaborate statement of the facts, the pleadings, and the action of the Appellate Court, made the following among many other points in a quite lengthy argument, which is here considerably condensed :

Those parts of the Appellate Court record which were specified in the certificate of the two judges of that court, and their certificate of the facts found by the Appellate Court,

should have been certified by the clerk of that court, and filed in the Supreme Court, and when so certified and filed, constitute the only record which this court should consider in the determination of the present appeal. Appellate Court Act, secs. 8, 91, 88; Laws of 1877, p. 154.

It is a well settled rule of this court that error can not be assigned on a ruling of the court below, unless exceptions were taken to the same at the time. *Vanderbilt* v. *Johnson*, 3 Scam. 48; *Smith* v. *Lusk*, 3 id. 411; *Smith* v. *Moore*, 3 id. 463; *Board* v. *Greenbaum*, 39 Ill. 615; *McPherson* v. *Hall*, 44 id. 264; *Allen* v. *Payne*, 45 id. 339; *Smith* v. *Cahill*, 17 id. 367; *Alden* v. *Nichols*, 68 id. 250; *Reynolds* v. *Hopper*, 70 id. 288.

A point is made that the city had no knowledge that the bond in suit was signed in blank, but the Appellate Court has found otherwise upon the facts.

Notice to the city clerk of the infirmity of the bond was notice to the city,—citing Angell & Ames on Corp. sec. 305; *Danville Bridge Co.* v. *Pomeroy et al.* 15 Pa. St. 151; *Trenton Banking Co.* v. *Woodruff et al.* 2 Green N. J. Eq. 117; *Custer* v. *Tompkins Co. Bank*, 9 Pa. St. 27; *Wing* v. *Harvey*, 27 Eng. L. and Eq. 140.

The law constituted the city clerk the agent of the city to receive the bond in suit, and it was his duty to communicate to the city whatever came to his knowledge affecting its validity, and notice to him was notice to the city. *Porter* v. *Bank of Rutland*, 19 Vt. 410; *New Hope, etc., Bridge Co.* v. *Phœnix Bank*, 3 N. Y. 156; *Selden* v. *Del. and Hud. Canal Co.* 29 id. 634; *Fulton Bank* v. *New York and Sharon Canal Co.* 4 Paige, 127; *Pitts., Ft. W. and C. Ry. Co.* v. *Ruby*, 38 Ind. 294; *Great Western Railway* v. *Wheeler*, 20 Mich. 419; *McEwen* v. *Montgomery County Mut. Ins. Co.* 5 Hill, 101; Dillon on Mun. Corp., sec. 39; *McCormick* v. *Bay City*, 23 Mich. 457; *Harrington* v. *School District*, 30 Vt. 155; *Hayden* v. *Templer Co.* 10 Mass. 397; *Nichols* v. *Boston*, 98 id. 39; *Smith* v. *Board of Water Comrs.* 38 Conn. 208; *Field* v.

*Mayor, etc., of New York,* 6 N. Y. 179; *Hall* v. *City of Buffalo,* 40 id. 193.

Notice to Mr. Clyde, the assistant to the corporation counsel, was notice to the city. *Williams* v. *Tatnall,* 29 Ill. 533; *Allen* v. *McCalla,* 25 Ia. 464; *Bierce* v. *Red Bluff Hotel Co.* 31 Cal. 165.

The alteration of the bond by filling it up after its signature by the sureties rendered it void as to them. The contract of suretyship must stand as it is actually made, and it can not be enlarged or extended by implication, without the knowledge or consent of the surety himself. *Stull et al.* v. *Nance,* 62 Ill. 55; *Miller* v. *Stewart,* 9 Wheat. 703; *Leggett et al.* v. *Humphreys,* 21 How. 75; *Smith* v. *United States,* 2 Wall. 235.

A sealed obligation left blank as to amount, etc., is a nullity, and can not be filled up and made valid without the authority of the obligor. *Laus* v. *The People,* 3 Gilm. 327; *The People* v. *Organ et al.* 27 Ill. 27; *Chase* v. *Palmer,* 29 id. 306; *Church* v. *Noble,* 24 id. 291; *Bartlett* v. *Board of Supervisors,* 59 id. 364; *Ingraham et al.* v. *Edwards,* 64 id. 526; *Clandaniel* v. *Hastings,* 5 Har. 408; *McNult* v. *McMahon,* 1 Head, 98; *The People* v. *Kneeland,* 31 Cal. 238; *Lovett et al.* v. *Adams et al.* 3 Wend. 380; *Smith et al.* v. *United States,* 2 Wall. 219; *Pawling* v. *United States,* 4 Cranch, 219; *Doane* v. *Eldridge,* 16 Gray, 254; *Ayers* v. *Harness,* 1 Ham. (O.) 173; *Gilbert* v. *Anthony,* 1 Yerger, 149; *Byrn* v. *McClanahan,* 6 Gill & J. 250; *Parminter* v. *McDaniel,* 1 Hill (S. C.) 267; *Boyd* v. *Boyd,* 2 N. & Mc. 125; *United States* v. *Nelson,* 1 Brock. 64; *McKee* v. *Hicks,* 2 Dev. 379; *Borden* v. *Southerland,* 70 N. C. 528.

While we insist that a bond under seal, executed in blank, standing by itself and upon its own merits, is absolutely void, there are authorities of respectable courts, sufficient in number, perhaps, to establish that such instruments so executed may become binding upon the parties under conditions which, when fairly analyzed, resolve themselves into these:

1. When the blanks are filled in accordance with an agreement or understanding made at the time of the signing.

. 2. When the paper, signed and sealed in blank as to its material parts, has been delivered by the signer to another person, subject to a private understanding, and has been filled up in perfect form and delivered to the obligee in such perfect form, as a completed instrument, by such other person, although in violation of such private understanding, the obligee having no knowledge or notice of the understanding, and nothing appearing upon the face of the instrument to excite suspicion.

A failure to file the bond within fifteen days after the canvass, vacated the office therein described, and thereupon all liability upon the bond terminated. Charter of Chicago, ch. 2, secs. 2, 3, 22, 25, 27; *The People* v. *Percells*, 3 Gilm. 59.

Our next position is, that the bond was limited to the term which became vacant, and that it fell with that term. The principle is well settled, that when it is made the duty by law of officers at a given time, or on the happening of an event, to make an appointment, or to cause an election to be held, to fill an office, their neglect to make such appointment, or cause such election to be held, can not extend the liability of the sureties upon the bond of the officer holding over by reason of such neglect, but the provision of law imposing the duty to appoint or elect enters into the obligation, and the sureties are presumed to contract on the faith of it, and their liability terminates when in due course of law such appointment or election should have been made. *County of Wapello* v. *Bingham et al.* 10 With. 43; *S. C. Society* v. *Johnson*, 1 McCord, 41; *United States* v. *Nicholl*, 12 Wheat. 505; *Walsh* v. *Bailie*, 10 Johns. 180; *United States* v. *Boyd*, 15 Pet. 187; *Riddell* v. *School District*, 15 Kan. 168; *Mayor* v. *Horn*, 2 Del. 190; *Chelmsford County* v. *Demerest*, 7 Gray, 1; *Mayor of Rahway* v. *Crowell*, 40 N. J. (Law) 207; *Winneshiek Co.* v. *Maynard*, 44 Ia. 15.

A class of cases is cited in which it has been held that a provision that an officer shall file his bond or take the oath of office within a prescribed time, without more, is directory. only. Such are *Kearney* v. *Andrews,* 2 Stock. (Ch.) 70, *The People* v. *Holly,* 12 Wend. 480, *State* v. *Porter,* 7 Ind. 204, *Glidden* v. *Towle,* 11 Foster (N. H.) 166, *State* v. *Churchill,* 41 Mo. 41, and *State* v. *County Court,* 44 id. 231.

In these cases there were no accompanying provisions, as in this case, defining the penalty and the consequences of the failure to file the bond within the time fixed, such as "shall be deemed to have refused to serve," the office "shall become vacant," and "shall be filled by appointment," etc. *State* v. *Tucker,* 54 Ala. 205.

The sureties of a public officer can not be held liable for money received by such officer before the execution of the bond, unless the money remained on hand at the time of its execution. *Inhabitants, etc.* v. *Randall,* 105 Mass. 295; *Farrar* v. *United States,* 5 Pet. 374; *United States* v. *Boyd,* 15 id. 208; *United States* v. *Eckford's Exr.* 1 How. 262; *United States* v. *Boyd,* 5 id. 48; *Breece* v. *United States,* 17 id. 443; *Nolley* v. *County Court,* 11 Mo. 287; *State* v. *Rhodes,* 6 Nev. 352; *Mahaska* v. *Ingalls,* 16 Ia. 85; *Bessinger* v. *Dickenson,* 20 id. 261; *Paw Paw* v. *Eggleston,* 25 Mich. 36; *Detroit* v. *Webber,* 29 id. 24; *Bissell* v. *Saxton,* 66 N. Y. 55; *Patterson* v. *Inhabitants, etc.,* 38 N. J. (Law) 256; *Vivian* v. *Otis,* 24 Wis. 518.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

It is insisted by appellants that the instrument in question is a nullity as to the sureties, they having signed it with the blanks in it which it had, and those blanks being subsequently filled without their consent or knowledge, and the case of *The People* v. *Organ,* 27 Ill. 29, is referred to in support of the position. That case does decide, that the filling the blank in a bond with the amount of the penalty, after the sureties had executed it, without their knowledge or consent, rendered it

void, as to them.   But that decision was made under, and in conformity to, the ancient doctrine of the common law that an authority to execute a sealed instrument for another must be of as high a character as the instrument, and therefore that a parol authority was not adequate to authorize an alteration or addition to a sealed instrument; the decision recognizing as the rule that a paper signed and sealed in blank, even with verbal authority to fill the blank, which is afterwards done, is void as to the parties so signing and sealing, unless they afterwards deliver, or acknowledge, or adopt it.   Among the cases there cited in support of the decision was that of *United States* v. *Nelson & Meyers*, 2 Brock. 64, decided by Chief Justice MARSHALL.   That was the case of a paymaster's official bond. There were blanks there which were filled after signing, and they were identical with those here, to-wit: amount of penalty, names of sureties, date, and name of office.   The question was whether authority to fill the blanks should be implied, and that great judge, with much hesitation, held that it should not.   But he admitted that express authority would have been sufficient, and asserted that but for the ancient distinction between sealed and unsealed instruments in this regard, implied authority would exist;   that *Speake* v. *United States*, 9  Cranch, 28, (where an express parol authority had been declared sufficient,)undoubtedly went far towards establishing the sufficiency of implied authority in such cases, and he predicted that the Supreme Court would probably completely abolish the distinction in this particular between sealed and unsealed instruments, and concluded his opinion as follows: " I say with much doubt, and with a strong belief that this judgment will be reversed, that the law on this verdict is, in my opinion, with the defendants."   The prediction, as will be seen, has been verified, though the judgment was not reversed, the case not having been carried any farther.

In *Smith* v. *Crooker*, 5  Mass. 538, Chief Justice PARSONS, in the case of the official bond of a town treasurer, laid down the rule in general terms, that a party executing a bond

"knowing that there are blanks in it to be filled up by insert-ing particular names or things, must be considered as agree-ing that the blanks may be thus filled after he has executed the bond." Although that was but the case of the writing in of the name of the surety after he had signed the bond, the rule is laid down generally, and is the one which courts subse-quently have declared, and which agrees with, as we consider, the now prevailing doctrine.

*Butler* v. *United States,* 21 Wall. 272, decided by the Supreme Court of the United States in 1874, was a suit upon an inter-nal revenue collector's bond in the penalty of $15,000, executed by Emory as principal, and by Butler and others as sureties. Butler pleaded that when he signed and sealed the bond it was a printed form, with names, dates and amount of penalty in blank; that he delivered it to Emory under an express agreement that the latter should fill the blank with a penalty of only $4000, and procure two other sureties in the District of Columbia each worth $5000, otherwise the bond was not to bind Butler, and not to be delivered, but returned to him. That Emory fraudulently filled the bond with a penalty of $15,000, and with two additional sureties, neither of whom resided in said District or was worth $5000, but insolvent. This plea was held bad.

The court say: "Every blank space in the form was open. To all appearances any sum that should be required by the government might be designated as the penalty, and the names of any persons signing as co-sureties might be in-serted in the space left for that purpose. It was easy to have limited this authority by filling the blanks, and the filling of any one was a limitation to that extent. By inserting in the appropriate places the amount of the penalty, or the names of the sureties or their residences, Butler could have taken away from Emory the power to bind him otherwise than as thus specified. This, however, he did not do. Instead, he relied upon the good faith of Emory, and clothed him with apparent power to fill all the blanks in the paper signed in

such appropriate manner as might be necessary to convert it into a bond that would be accepted by the government as security for the performance of his contemplated official duties. It is not pretended that the acts of Emory are beyond the scope of his apparent authority. The bond was accepted in the belief that it had been properly executed. There is no claim that the officer who accepted it had any notice of the private agreement. He acted in good faith, and the question now is, which of two innocent parties shall suffer? The doctrine of *Davis' case* is, that it must be Butler, because he confided in Emory and the government did not. He is, in law and equity, estopped by his acts from claiming, as against the government, the benefit of his private instructions to his agent."

We have quoted thus at length from the fact that this case so fully covers the ground of the case before us, and enunciates the modern doctrine of courts upon this subject, especially in respect of official bonds, and see *Dair* v. *United States*, 6 Wall. 1 ; *Drury* v. *Foster*, 2 id. 24.

*Inhabitants of South Berwick* v. *Huntress*, 53 Me. 89 (1865), was an action upon a collector's official bond. It is a very well considered case and is directly in point, holding "that a party executing a bond knowing that there are blanks in it to be filled up, necessary to make it a perfect instrument, must be considered as agreeing that the blanks may be thus filled after he has executed the bond," and that this rule extends to the filling up of the blank for the penal sum in the bond, remarking upon the penalty being viewed as almost a matter of form, the condition being the essential portion embracing the real obligation.

The same doctrine of implied authority in such case was also asserted in the case of *State* v. *Pepper*, 31 Ind. 76, (1869.)

*McCormick* v. *Bay City*, 23 Mich. 457, ( 1871,) was a suit upon a bond given to secure the official conduct of the comptroller of Bay City. McCormick, one of the sureties, offered to prove, as a defence, that McKinney, the principal, induced

him to sign the bond while the names of the sureties and the penalty were in blank, but under an agreement that he was not to use it unless he obtained certain specified sureties, and that he delivered the bond contrary to this agreement. But this was held to be no defence, on the ground that McCormick made McKinney his agent to complete and deliver the instrument, and having authorized his agent by visible authority to fill up and deliver it, and the only limit to his apparent authority being by secret instructions, he was bound by McKinney's acts.

The court say : "We have, then, a case of a person who has entrusted another with power to fill up and procure signatures to, and deliver an official bond, and taken no steps to prevent an abuse of his agency, and we have, as a consequence, the acceptance of the bond without negligence, and the obtaining by means of it of an important public office, and the control of public funds. We can conceive of no stronger case for the doctrine of estoppel, and we approve the rules recognized in *State* v. *Pepper,* 31 Ind. 76, and cases there cited, and in *State* v. *Peck,* 53 Me. 284, and *Inhabitants of South Berwick* v. *Huntress,* 53 Me. 89."

In the case of *State* v. *Young et al.* 23 Minn. 551, (1877,) in a suit upon the official bond of a county treasurer, the bond had been signed by the sureties with a blank in the place for the penal sum, and by the principal delivered to the county auditor, and afterward the blank was filled by the county auditor by the direction of the board of county commissioners with the sum of $25,000, in the absence of the sureties. The sureties were held liable, the court holding that parol authority is sufficient to authorize the filling of a blank in a sealed instrument, and that such authority may be given in any way by which it might be given in case of an unsealed instrument; that such authority may be implied from circumstances; that there was there an apparent implied authority to the board upon which they had a right to act; that the sureties were estopped from denying the existence of the apparent

and presumptive state of facts which they, by their conduct, had authorized the board to believe and act upon; and that the apparent authority with which they clothed the board must be held to be the real authority.

These authorities declare the now prevailing rule upon this subject, and the reasons of the rule. They sufficiently show that the courts have entirely drifted away from the decision in the case of *The People* v. *Organ.* Or rather, perhaps it may more properly be said, that the old technical rule of the common law upon which that decision was based has become overborne in operation, in this respect at least, of filling blanks in official bonds, by the application of the doctrine of estoppel *in pais,* a principle, at least in its present broadness of scope, of modern growth. The first distinctive enunciation in England of the branch of estoppel, known as estoppel by conduct, is said to have been in *Pickard* v. *Sears,* 6 Ad. & E. 469, and in this country in *Welland Canal Co.* v. *Hathaway,* 8 Wend. 480. See Bigelow on Estoppel, 473, 476.

This court has since departed from that case of *The People* v. *Organ,* and placed itself in harmony with the class of authorities which have been cited.

In *Bartlett* v. *Board of Education,* 59 Ill. 364, the official bond of the treasurer of a school district had been signed by the sureties with a blank in it for the penalty, and the blank was afterward filled by the principal obligor with the amount of the penalty, in the absence and without the knowledge or consent of the sureties, and the bond was held valid as to them on the ground that it might be inferred from the circumstances that the sureties authorized the filling of the blank.

This decision was based upon a different line of authorities from those in the former case, and in repudiation of the old rule then acted upon; among the authorities on which the last decision was based being the case of *Texira* v. *Evans,* referred to in 1 Anstruther, 228, where Evans, wanting to borrow money, executed his bond with blanks for the name

and sum, and sent an agent to raise money on the bond. Texira lent £200 on it, and the agent accordingly filled up the blanks with that sum and Texira's name, and delivered the bond to him. On *non est factum* pleaded, Lord MANSFIELD held it a good deed; that parol authority to fill the blanks was valid.

In *Smith* v. *Board of Supervisors*, 59 Ill. 412, the official bond was signed by the sureties and left with the principal obligor and he delivered it to the obligee in violation of a secret understanding between himself and the sureties, not known to the obligee, and the instrument was held binding upon the ground that the possession of the bond so signed clothed the principal with apparent implied unqualified authority to deliver the bond, and therefore the obligee was justified in treating with him as in fact having such unqualified authority; and see *Comstock et al.* v. *Gage*, 91 Ill. 328.

The filling up of all the other blanks in the bond in suit, except that for the penalty, was but mere form. It is said the name of the office was not stated, and that so there was an uncertainty what office it was, in respect to which the bond was given. There was none at all. The surrounding circumstances are always admissible to show and explain the meaning of a written instrument. Reading this bond as it was signed, in the light of the surrounding circumstances, there could be no possibility of doubt that the office intended was that of treasurer of the city of· Chicago. The bond itself, too, recited that the office was one "in and for the city of Chicago" to which the "above bounden" had been elected or appointed; and it was to the office of treasurer of that city to which the first "bounden" in the bond, to-wit, Gage, had just been elected. The provision of law for the fixing of the amount of the penalty strengthened the inference in this particular case of an implied authority to fill the blank for the penal sum; it not being one to be fixed by agreement of parties as in the case of ordinary bonds. By the law the amount of the penalty was to be determined upon

by the common council, to be fixed by them in such amount —not less than $200,000—that they deemed the safety of the interests of the city required. Some of the cases cited remark upon the penalty being in a certain sense almost a matter of form. The condition of the bond is the essential feature of it; it states what the sureties undertake for, and what they are liable for. The penalty but limits the amount of the damages which can be recovered from them for the breach of their undertaking.

Appellees claim that there was notice here on the part of the city of the secret understanding of the sureties, or one of them, that the penalty of the bond was not to be more than $250,000. If such were the fact we would agree with them as to the fatal effect. The disagreement is in regard to what facts will constitute such notice. It is claimed that the notice to Hotchkiss, the city clerk, to Holden, the alderman, and to Clyde, the clerk in the office of the corporation counsel, that the blanks in this bond were filled subsequently to the signing of the bond by the sureties, and in their absence, was notice to the city of such fact, and that that would be sufficient notice to the city of the secret condition upon which the sureties signed the bond.

Waiving the question whether the knowledge by the persons named, of such signing in blank and subsequent filling of the blanks, would be notice of such facts to the common council, who were the body appointed by law to approve and accept the bond, and thus notice to the city, we will assume that it would. But we can not then assent to the view taken, that the knowledge by the city of those facts affected the city with notice of the secret condition upon which the sureties signed the bond.

The position taken is, that any material defect whatever apparent upon the face of the bond is sufficient to give notice of the actual facts respecting the condition of the execution of the bond. There were several defects here apparent upon the face of the bond, but no one of them, that we can see,

should affect the obligee with notice that it was the understanding of the sureties that the penalty of the bond was not to be more than $250,000, or put them upon inquiry on the subject to ascertain whether it was not to be any larger than that. Surely, the lack of a date in the bond would not do so; nor the absence of the names of the sureties in the body of the bond; nor the omission of the name of the office; and no more so, as we conceive, did the blank in the bond for the penal sum. This could not excite suspicion of there having been a limitation of the amount of the penalty. One could reasonably be led to infer no more from it, than that as by the law the amount of the penalty was to be fixed by the common council, the penal sum had been left blank to be filled in when the common council should have determined what the amount of the penalty should be. Under the decisions, the principal obligor had an apparent implied authority to fill up the blank, and the blank was filled by his direction.

The obligee was justified in assuming, and acting upon the assumption, that Gage really possessed the authority with which he was apparently clothed. Knowledge of the unfilled blank for the penalty was but knowledge of the implied authority to fill it; and consequently could be no ground of suspicion of the lack of authority. The imperfection upon the face of the bond which is to have the effect of the notice contended for, must, as we regard, be of such a character that it points towards, indicates, and excites suspicion of the particular matter of defence alleged against the instrument, and, as an ordinarily prudent man, to put the obligee to make inquiry as to the existence of the very thing which is set up in defeat of the instrument—as in this case, the condition of the limitation of the penalty to $250,000. Every one of the cases cited by appellees' counsel are cases of this character. All but two of them are of this class, namely: where in the body of the bond several persons are named as co-obligors, and it is signed by only a portion of the persons named in the bond as obligors, and it was set up in defence to the bond

by the signers, or a portion of them, that they signed the bond upon the condition and agreement that all or certain named of the obligors mentioned in the bond were to sign it before delivery, and that they had not done so. In such case the bonds purported to be the bonds of those who never executed them, and indicated on their face that they had not been completed according to the original intention, and properly enough the obligees were held to be put upon inquiry whether those who had signed consented to the bonds being delivered without the signatures of the others who were named as co-obligors; the defect in the bond indicating on the face of the instrument the very thing which was set up in defeat of the bond.

Of the other two cases thus cited, one was that of the erasure of the signature of one of the sureties to a bond before its approval. The defence was, this alteration of the bond. The alteration was apparent on the face of the bond.

The other case was that of a collector's bond being altered after its execution, by reducing the amount of the taxes to be collected, without the knowledge or consent of the sureties. The alteration appeared upon the face of the bond, and was held notice to the parties receiving it.

Thus it will be seen that in every one of these cases the very matter of exception taken to the validity of the bond was indicated upon the face thereof, or the circumstance of incompleteness in the instrument pointed at and indicated on the face of the bond the existence of that particular secret condition or agreement which was set up as attending the signing of the bond, and as defeating it.

This is all that the exhaustive research of the very able counsel for appellees has produced in the way of authority in support of this last position, that a defect in a bond is notice; and we do not consider that the authorities at all meet the exigency of the present case.

The point in this respect, of notice, is not whether there was knowledge of the existence of these blanks unfilled, but

whether there was notice of this secret understanding in regard to the amount of the penalty of the bond. It is in reality a question of good faith,—whether these blanks in the bond indicated the existence of the secret understanding as to the amount of the penalty, and should have put the obligee upon inquiry whether the sureties consented to the delivery of a bond with a larger penalty than $250,000. We do not think such a circumstance as the blanks in the bond was in any way indicative of such a secret understanding, or excited any suspicion of its existence, or put the obligee upon any inquiry as to such an understanding, and we must believe the obligee acted in entire good faith in taking the bond.

The cases cited by appellees' counsel do not, as we view them, decide anything to the contrary. There may be found in one or more of them some such general expression as that the instrument when delivered must be perfect on its face, or otherwise the obligee is chargeable with notice of the facts, and can not claim the benefit of this rule of protection; but such general observation must be taken with reference to the facts of the particular case, and as applying to an imperfection of the character there appearing; the defect in the case where the language was used being, as before said, that one whose name was in the body of the bond had not signed it.

The bond signed and sealed by the sureties was presented by Gage to the common council as his required official bond. The common council were not to suppose that the sureties had done a mere idle thing, or that they were dealing deceitfully with the council, in tendering this bond for their acceptance, and having in reserve a secret understanding which should nullify the bond. But they had the right to think the sureties meant honestly, and intended that the instrument they had signed should be accepted as, and serve for, the official bond of Gage. And although there were the unfilled blanks in the instrument, they saw that Gage had implied authority to fill them in such appropriate manner as might be necessary to make it such that it would be accepted by the

common council as Gage's official bond as city treasurer, as they were so informed by decisions of the highest courts in the land. Of course then the blanks in the bond were no indication of the want of authority, and could not put the obligee upon inquiry as to its existence.

Another point which is made against the validity of the bond is, that failure to file the bond within fifteen days after the canvass vacated the office therein described, and thereupon all liability under the bond terminated.

The position is, that the provision requiring a bond to be filed by the treasurer elect within fifteen days after the official canvass has been declared is mandatory, and that a failure to file the bond within that time *eo instanti*, upon the termination of the time, absolutely vacates the office.

It is insisted on the contrary, that the sections of the charter on this subject taken together were intended merely to empower the mayor and council, in their discretion, to declare a vacancy and appoint a successor, or to waive the default as to the mere time of filing bond, and to accept and approve it when afterwards filed; therefore, a failure to file in time does not, of itself, annul or avoid the right or title to the office, but merely renders it voidable or defeasible. That if the officer files his bond strictly in time, his right and title to the office are indefeasible. If he files it afterwards, and it be accepted and approved, his right and title thereupon become equally indefeasible.

This latter seems a reasonable construction, and is one which we are disposed to adopt. Gage derived his title to the office from the election. The law does not favor forfeitures, and "in enforcing forfeitures courts should never search for that construction of language which must produce a forfeiture, when it will bear another reasonable construction." *Hartford Ins. Co.* v. *Walsh*, 54 Ill. 168.

Suppose the filing of the bond within the fifteen days had been prevented by some inevitable accident, but the very next day after the officer filed his bond, which was accepted and

approved,—in reason, why should not that suffice, and the officer have right to the office for the term for which he was elected? The aim of the statute would be fulfilled. The object of the statute was not a change of person to hold the office, but to secure an official bond. That having been given, the person whom the people had elected would seem the more proper person to have the office, than one appointed by the mayor and council.

It is conceded that after the expiration of the fifteen days the mayor and council would have been fully justified in refusing to accept and approve this bond, because of this default; and in appointing Gage's successor, as in the case of *Ross* v. *The People,* 78 Ill. 375. Had they so elected, Gage's right to the office would have been forfeited, and a person appointed who would give a bond. But (in theory at least) the rights and interests of the public were made equally secure by electing to waive the right of forfeiture and accepting and approving the bond in suit, after the fifteen days.

"There is a known distinction," says Lord MANSFIELD, "between circumstances which are of the essence of a thing required to be done by an act of Parliament, and clauses merely *directory.* The precise time, in many cases, is not of the essence." *Rex* v. *Loxdale,* 1 Burr. 447. It seems reasonable that it is only when "the rights of the public, or of third persons, depend upon the exercise of the power or the performance of the duty to which it refers," that the statute should be held mandatory, and otherwise but directory. *Kane* v. *Footh,* 70 Ill. 590; and see Sedgw. Stat. and Const. Law, 368–74. Here, the essence of the thing to be done,—that upon which the rights of the public depend,—is the giving of the bond, not the precise time when it is done.

There are numerous authorities that a provision of law, that an officer shall give bond within a prescribed time after his election, is directory only. *The People* v. *Holly,* 12 Wend. 480; *State* v. *Churchill,* 41 Mo. 41; *State* v. *Porter,* 7 Ind. 204; and see *Kearney* v. *Andrews,* 2 Stock. Ch. 70, *Speake* v.

*United States*, 9 Cranch, 28.   The other clauses in the charter,
"he shall be deemed to have refused said office and the same
shall be filled by appointment," or, (if held to apply here)
" the office shall become vacant," it may be held do not change
the rule, as the following authorities show, in the case of
words even more explicit than these.

In *State* v. *Toomer*, 7 Rich. (Law) 216, the statute required
the master in chancery, within three weeks after his election,
to tender his bond for approval, and upon its approval, to
deposit it with the treasurer and sue out his commission, and
that "upon his neglect or failure to do so within the said
time, his office shall be deemed absolutely vacant, and shall
be filled by election or appointment, as heretofore provided."

But the court held that the failure to comply with this
requirement was only cause of forfeiture, but not a forfeiture
*ipso facto*.   That by a strict compliance with the directions of
the statute, the title of the office was protected against forfeit-
ure, "and that if the State sees proper to excuse his delin-
quency by granting him his commission, the defects of his
title are cured, and it is converted into a title *de jure*, having
relation back to the time of his election."

In *Sprowl* v. *Lawrence*, 33 Ala. 674, the statute required
the sheriff to file his official bond in the office of the probate
judge, before entering upon the duties of his office, and
within fifteen days after his election.   The statute also ex-
pressly declared that if he failed to file his bond within the
time prescribed by law, he vacated his office.   The court there
say :  " By virtue of his election, Duncan was sheriff, so far as
his mere right to the office was concerned, before he executed
his bond.   *   *   *   The election having thus invested him
with his title to the office, the statute requiring him to file his
bond within fifteen days, and providing that on his failure to
do so he ' vacates his office,' operates as a defeasance, and not
as a condition precedent," and concluding as follows :  "Our
conclusion is, that the failure of a legally elected sheriff to
file his bond within the time prescribed, does not, by its unaided

force, operate his instantaneous removal from office; and that a bond executed by him more than fifteen days after his election, and before any steps or proceeding on the part of the State to effect his amotion, must be considered as the bond of an 'officer' within the meaning of section 132 of the code," that is, of an officer *de jure.*

It is suggested by appellees' counsel, that this last case has been overruled by that of *State ex rel.* v. *Tucker,* 54 Ala. 205. But upon examination, we understand this to be so only in part, that is, in so far only as the former case seemed to require a judicial ascertainment of the vacancy before the appointment of a successor could be made.

Appellees lay stress upon these particular words in the condition of the bond, " or until said office shall be otherwise legally vacated." As the bond was signed by the sureties before the expiration of the fifteen days, it is contended that these words have reference to this very contingency of not filing the bond within fifteen days, and that by such express words of limitation, the sureties were not to be liable upon the bond if it was not filed within the fifteen days. We do not think it can fairly be said that in the use of these words the sureties intended to express the idea that they would not be liable upon the bond if it was not filed within the fifteen days; or that any special significance is to be attached to the use of the words.

The condition, in describing the office to which Gage had been elected, proceeds to speak of the length of the term of office, using the words, "to hold said office for the period of two years, and until his successor shall be duly elected and qualified or until said office shall be otherwise legally vacated" —but reciting what was the legal duration of the office. We think that these words referred to something to take place after the delivery and acceptance of the bond. That the meaning of the bond was that the sureties guaranteed that during the entire term which was fixed by law, Gage would continue faithfully to discharge the duties of the office to

which he had been elected unless, after execution and delivery of the bond, such office should be legally vacated.

On November 20, 1871, the canvass of the votes was made and the common council declared Gage elected, and on the 27th of the same month he took and filed his oath of office. Although he had taken steps towards procuring his proposed bond, and had obtained the names of those who were willing to become his sureties, he failed to perfect it and to file it with the city clerk within the fifteen days, but neither the mayor nor the council either declared the office vacant, or appointed his successor; and when afterwards he did present his perfected bond, they accepted and approved it. Upon the faith of the security of this bond he held and enjoyed the office for the full term of two years, and was intrusted with the public moneys. The apparent implied authority with which the sureties had clothed Gage to make use of and deliver this bond as his official bond, by signing and sealing the same and leaving it with him, was a continuing authority, until some step was taken by the sureties towards its revocation.

Not a step was taken in that direction.

We do not think the sureties have the right now to set up in defeat of the bond that it was not accepted and approved and filed with the city clerk within the fifteen days prescribed in the charter.

Another question arises upon the ruling of the circuit court in excluding questions put to Gage when on the stand as a witness, as to whether certain balances were in his hands, as treasurer, at specified dates. He was asked whether the balance of $519,508.07, which appeared charged against the city treasurer on December 4, 1871, the day of the commencement of his second term, was at that time actually in his hands. The same question was put with reference to December 11, 1871, and January 11, 1872. He was also asked whether or not the balance appearing to be in his hands December 16, 1873, of $507,703.58, was at that time actually

40—95 ILL.

loaned out for the benefit of the city of Chicago. The questions were all excluded and exception taken.

Gage was his own successor in office. It was his duty as incoming treasurer to receive the treasury balance from his predecessor. If he entered it in his treasury books after the beginning of his second term as having actually come to his hands from his predecessor, and continued afterward from time to time to return and report the same as in his hands, both he and his sureties, we think, should now be concluded from denying that this balance did actually come into Gage's hands as treasurer. The law transferred any balance on hand to his second term.

The treasurer's monthly accounts or statements were in evidence, embracing the month of April, 1872, and continuing to the month of November, 1873, inclusive. These were each sworn statements, and they each commence with a statement of "balance in treasury" at the close of the next preceding month, and end with a statement of the "balance in treasury" at the close of the month covered by the account or return.

Gage's annual reports for the fiscal years ending March 31, 1872 and 1873, were also in evidence. He states in them he "submits here his annual report, with all receipts and expenditures during the fiscal years ending March 31, 1872 and 1873, respectively, and the amount in the treasury" at these respective dates. The entries in Gage's official books, in evidence, showing the same as the above, were all official entries, expressly enjoined by statute, the charter directing the city treasurer to keep books and accounts.

The same is true of the treasurer's monthly accounts and statements to the comptroller, and of his annual reports to the common council. He shall render a monthly statement or account to the comptroller, "showing the state of the treasury at the date of such account, and the balance of money in the treasury." He shall annually report to the common council "a full and detailed account of all receipts

and expenditures during the preceding fiscal year, and the state of the treasury." These are the positive requirements of statute. The comptroller is chief of the treasury department, which has control of the fiscal concerns of the corporation. By the charter these books and accounts are to be always subject to the inspection of the comptroller and the finance committee of the common council; to the comptroller, as chief, the treasurer must make a monthly settlement of his treasury balance, based upon a stated account under oath, showing such balance, accompanied with warrants paid, and all other vouchers held by him, and which shall be delivered over to the comptroller and filed with his said account in the comptroller's office upon every day of such settlement. The charter required the treasurer to verify both his monthly accounts and annual reports by his oath, in writing, declaring that such statement, so far as he knows or has reason to believe, is a fair, accurate and full statement of the matters to which it relates, and of all moneys in his hands, etc.

In the discharge of the various duties which are required to be performed by the comptroller in relation to the financial affairs of the city, he necessarily acts upon the treasurer's books and monthly statements or accounts, together with the vouchers returned therewith, and the annual reports. He has no other data upon which to proceed, and he has a right to rely upon these.

Upon them and the doings of the comptroller based thereon, the common council and the public at large implicitly rely as at all times affording a correct exhibit of the true treasury balance, which, in contemplation of law, is in the hands of the treasurer. They are the foundation upon which the fiscal concerns and financial policy of the municipal government are based.

These are the official books, statements, accounts and reports, kept and made as thus required, by and upon which appear and are shown the treasury balances which it is sought to falsify.

These balances were brought forward from Gage's first term, and stated and repeatedly restated in his said reports and monthly accounts made and rendered during his second term as being actually in his hands, down to the time when he was required to turn over the treasury balance to his successor in office. His official books carried forward to the close of his second term on the basis of the treasury balances, which, from month to month and from year to year during this term, he stated to the comptroller and common council, show the balance claimed in this suit to have been in his hands at the time he was required to pay over to his successor in office.

The correct keeping and making of such books, accounts, etc., was one of the duties of the office expressly enjoined by law, and which the sureties undertook the treasurer should perform, one of the conditions of the bond being that Gage "shall well and faithfully perform the duties of said office as prescribed and required by law."

The treasury balances appearing were shown and exhibited in and about the actual performance of an express duty of the office. They were of the *res gestœ* themselves.

To allow now, Gage or his sureties, in avoidance of the liability on their bond for these treasury balances, to falsify them, and show that these balances, so stated and reported as being in the treasury, were not at the time actually in the treasury, would be inadmissible, as we conceive, upon sound legal principle.

As respects Gage himself, it would seem to be quite clear that these statements of his of the treasury balances in his hands should be conclusive upon him.

It is a familiar principle that a public officer making a return of his doings upon a writ shall not be allowed to gainsay the truth of it. *Barrett* v. *Copeland*, 18 Vt. 67; *Hoyne* v. *Small*, 22 Me. 14; *Sheldon* v. *Payne*, 3 Seld. 453.

The principle upon this subject is laid down in *Cave* v. *Mills*, 7 Hurls. & Norm. 913.

That was a suit by a surveyor to the trustees of certain turnpike roads against the trustees to recover certain sums expended by him in the improvement of the roads. He had rendered to the trustees accounts of his receipts and expenditures for the years 1856, 1857, 1858, showing certain balances due to himself.

The suit was for sums knowingly omitted in the accounts for those years, and it was held that the plaintiff was estopped from recovering them.

One principle of law invoked by the defendants was, that the plaintiff having made a statement false of his own knowledge, upon which the defendants had acted, was bound by such statement. WILDE, B., who delivered the opinion of the court, after discussing this and another proposition, continues as follows: "We are of opinion that both these principles apply to the present case. Indeed they are but variations of one and the same broad principle, that a man shall not be allowed to blow hot and cold—to affirm at one time and deny at another—making a claim on those whom he has deluded to their disadvantage, and founding that claim on the very matters of the delusion. Such a principle has its basis in common sense and common justice, and whether it is called 'estoppel,' or by any other name, it is one which courts of law have in modern times most usefully adopted."

And we are of opinion that the sureties should be equally concluded here with Gage himself.

*Commissioners* v. *Mayrant*, 2 Brevard, 228, was a suit on a sheriff's official bond. During his term of office the sheriff wrongfully endorsed a levy of a sum of money upon an execution in his hands and returned the execution with the levy thereon, and failed to pay over the money. The sureties on the bond were held to be responsible for the amount returned as levied by the sheriff, although the same was not in fact levied. It was said the sheriff's return was an official act which bound him officially and made his sureties liable.

In *McCabe* v. *Raney*, 32 Ind. 309, a suit against principal

and sureties, joint makers of a promissory note, the principal having, by his statements to the purchaser of the note that there was no defence to it, precluded himself from setting up a defence to the note, his sureties were held also precluded, the court saying: "Any act of the principal which estops him from setting up a defence, personal to himself, operates equally against his sureties."

In *Stovall* v. *Banks*, 10 Wall. 583, the Supreme Court of the United States, in holding that sureties in an administration bond are bound by a decree against their administrator finding assets in his hands to the same extent to which the administrator himself is bound, say: "Certainly the administrator was concluded. And the sureties in the bond are bound to the full extent to which their principal is bound. * * * There may be special defences for a surety arising out of circumstances not existing in this case, but in their absence, whatever concludes his principal as an obligor concludes him."

In *Baker* v. *Preston*, 1 Gilmer (Va.) 235, an action upon a State treasurer's official bond, it was decided that the books kept by the treasurer were conclusive evidence of the balance actually in the treasury at any given time, both against the treasurer and his sureties, without being pleaded as an estoppel, so as to charge them with balances carried forward from year to year as if those balances were actually on hand.

In *The United States* v. *Girault et al.* 11 How. 27, a suit on the official bond of a receiver of public moneys, the breach assigned was, that on the 2d day of June, 1840, Girault, as such receiver, had received a large amount of public money, to-wit: the sum of $8952.37, which he had refused to pay to the United States.

To this breach the sureties pleaded: That on the 2d of June, 1840, and on divers days before that day, the said Girault gave receipts as receiver for moneys paid on the entry of certain lands therein specified, and returned the same to the treasury department to the amount of $10,000, and of which

the amount in the declaration mentioned was part and parcel. And that neither the $10,000, nor any part thereof, was paid to or received by him, the said Girault.

The plea was held bad on general demurrer. The court say: "The condition of the bond is, that Girault shall faithfully execute and discharge the duties of his office as a receiver of the public moneys. The defendants have bound themselves for the fulfilment of these duties; and are, of course, responsible for the very fraud committed upon the government by that officer, which is sought to be set up here in bar of the action on the bond.

"As Girault would not be allowed to set up his own fraud for the purpose of disproving the evidence of his indebtedness, we do not see but that, upon the same principle, they should be estopped from setting it up as committed by one for whose fidelity they have become responsible." And see *Morley* v. *The Town of Metamora*, 78 Ill. 394; *Evans* v. *Keeland*, 9 Ala. 42.

The official books, monthly statements or accounts and annual reports kept, made and rendered by Gage, during his second term, abundantly show a liability to the amount of the recovery in this case; and holding them to be of the conclusive character which we do, against both Gage and his sureties, it is needless to consider whether the books of Gage for the first term, showing a balance in his hands at the close of his first term, were properly received in evidence, or whether proof that the balance thus appearing was not at that time actually in Gage's hands, was improperly excluded. If there was error in such respects, it would be a harmless one, as such proof of any balance at that time was entirely superfluous and unimportant, in view of the other plenary evidence which there is in the case of the amount of the defendant's liability.

The question as to the balance shown by the record in Gage's hands December 16, 1873, being loaned out for the benefit of the city, is liable to the further objection that its

tendency, if answered affirmatively, would be to prove a breach of the bond in that respect. Under the charter the treasurer was required "to keep safely without loaning or using" the city money, and was permitted to deposit it at interest only by the authority of the common council manifested by ordinance or resolution, and in the manner prescribed by the charter. There is no pretence that such authority was ever given; on the contrary, there is evidence tending to show it was not given.

We find no material error in the ruling of the circuit court upon the admission or exclusion of evidence.

The judgment of the Appellate Court is reversed and the cause remanded, with directions to enter a judgment of affirmance of the judgment of the circuit court.

*Judgment reversed.*

DICKEY, J., took no part in the decision, having been of counsel in the case in the circuit court.