(No. 18746.— )
PATRICK McCRYSTALL, *et al.* Appellees, *vs.* ELIZABETH A. CONNOR, Appellant.

*Opinion filed June 23, 1928.*

MARTIN W. WATROUS, and JOHN E. FOSTER, for appellant.

KAMFNER, HORWITZ, HALLIGAN & DANIELS, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellees (hereafter designated complainants) filed their bill in the circuit court of Cook county praying the specific performance of an alleged written contract made

between them and defendant, Elizabeth A. Connor, for the purchase of a certain lot described, in the city of Chicago. The bill alleges the contract was signed May 7, 1925, and was for the sale and purchase of lot 2 in a subdivision in Kinzie's addition to the city of Chicago, known as 207 East Ontario street. A copy of the agreement is attached to the bill, and provides that complainants would purchase and defendant would sell the lot for $32,500; that $1500 was to be paid as earnest money on the day the contract was dated, $10,000 by the assumption of an existing trust deed on the lot, $6500 by a junior purchase money encumbrance, and $14,500 to be paid in cash on the day the contract was consummated. The bill alleges complainants complied in all respects with the contract, and pursuant to an appointment made with defendant on June 3, 1925, at the office of Baird & Warner, complainants tendered performance in accordance with the contract but that defendant failed to appear at the place of the appointment and failed to consummate the agreement; that complainants have always been ready and willing and able to comply with the terms of the contract, but that defendant refuses to comply with its terms on her part. The bill prays that she be decreed to specifically perform the agreement.

Defendant answered the bill, denying that on May 7, 1925, or at any other date, she made a written agreement with complainants to sell them the lot; denies she signed any written agreement to sell the lot to them on the terms mentioned in the bill; denies she made an appointment to meet them June 3, 1925, at the office of Baird & Warner, to consummate the deal; denies that they at that time and place, or at any other time or place, tendered her the purchase price of said lot, and admits she has refused, and still refuses, to comply with the terms of the alleged agreement set forth in the bill. She further answered at great length, setting up her version of how the alleged agreement was made. She denied complainants were entitled to any of the

relief prayed, and filed her cross-bill setting up the same facts substantially as alleged in her answer, and prayed that the alleged agreement be canceled and set aside as a cloud on her title.

After the answer to the cross-bill and replications thereto had been filed the cause was referred to a master in chancery to take the testimony and report it, together with his conclusions of law and fact. The master reported that the equities were with complainants and that the allegations of their bill had been proved to be true, and he recommended a decree for specific performance be entered in accordance with the prayer of the bill of complaint. He further reported that the cross-bill had not been proven, was without equity and should be dismissed. After overruling defendant's objections to the report they were renewed as exceptions before the chancellor, who also overruled them and entered a decree as recommended by the master. From that decree defendant has prosecuted this appeal to this court.

The master in his report summarized the evidence, which we think is too voluminous to be set out fully in this opinion, but it appears necessary to rather fully set out the substance of parts of it.

Forty-six errors are assigned in the assignment of errors. Many of them are substantially duplicates, and the errors relied on in appellant's brief are reduced to seven. That number might be still materially reduced, as the errors argued are that the contract was voidable under the Statute of Frauds, that a material change was made in it after defendant signed it, and that errors were committed in the admission of testimony.

Paul J. Coleman, a real estate salesman employed by Baird & Warner, realtors, conducted the negotiations leading up to the signing of the contract. He testified he learned appellant was the owner of the lot involved from the books in the office of Baird & Warner, with whom appellant had listed the property for sale. He called on her and got the

detailed information from her about two properties she had listed for sale. She requested him to advertise the property, and he did so. He told her of the result of the advertising, and that he had been unable to get anything that looked like a deal. One of the properties he had advertised is called the Dearborn street property and the one in controversy the Ontario street property. He said appellant gave him as an appproximate sale price for the Ontario street property $38,000. There was a first mortgage on the property. He told her he did not think they could get desirable results on the Dearborn street property but that there might be a market for the Ontario street property. She complained to him of the trouble she was having with her tenants, of her desire to go to Europe; that she wanted to sell her property—at least one of the pieces—as soon as she could, to get some of the worry off her mind and go to Europe. He afterwards got in contact with appellees. They owned property adjoining appellant's. He sought to sell the Ontario street property to different people besides appellees. On a visit he made to appellant's home he prepared a contract. He could not state the date, but, as he recollected, it was subsequent to February and prior to the middle of April, 1925. He wrote the contract on a regular real estate form, in ink, with a pen. Appellant named $35,000 as the sum she would sell for, with $18,000 cash. Witness took the contract to appellees. It had been signed by appellant but the vendees' names were not written in it. Appellees said they could not pay that much and refused to enter into the contract. Witness took it back to appellant and told her appellees would not pay the price she asked, and she tore up the contract. At his first interview with appellees they named $28,000 as the approximate price they were willing to pay. After he had reported to appellant and she had torn up the first contract he had prepared he had another interview with appellees, in which they raised the price they would be willing to pay to $30,000, with a

cash payment of $14,000. He reported that to appellant, who had previously told him she did not want to sell to appellees. When he reported the second offer of appellees, appellant said she did not think they had the money, and were not able to go through with the contract. She had previously told witness the reason she would not sell to appellees was that they were on bad terms and she did not wish to have any dealings with them. When he reported the second time about appellees, appellant said she thought that would not be enough for the property. He told her he thought that was as high as they would go, and she said she would not sell. Later appellees called witness and told him they were prepared to offer $32,500, with $15,000 cash. He told them he did not think appellant would accept that offer. Appellees suggested he had brought a contract to them signed by appellant, and asked if he would take a contract signed by them back to her. He said he would, and appellees called up their lawyer, who came to their house and dictated the contract. Witness took it over to Baird & Warner's and typewrote it. The next day he took it to appellant. It was signed by appellees in his presence. When he took it to appellant he told her it was the best he could do. He showed her the contract, and she said she wanted more cash. It does not appear that she then signed the contract, and later called witness to ask him if he could get any more money and if he was working on the deal. He told her it seemed impossible to get more money for the property; that he had done all he could to sell and that appellees were the most likely purchasers because they owned adjoining property. She said she would try elsewhere to sell the property for $32,500, with a $17,000 cash payment. Witness went out again and submitted the sale of the property to a number of people, among them a man who owned a garage on Superior street. He told appellant the garage owner on Superior street had considered the sale rather strongly—more than anyone else of the peo-

ple he offered the property to—and there was hope in that direction; that any purchaser who would buy the property would want to know that he could make a valid contract to sell it, and that if he was able to show the man a contract he might buy. She agreed to make out a contract for the purchase price of $32,500, with $16,000 cash payment, and that he could take it to the garage owner, or appellees, or anyone else who was good and who would buy the property. He then took out a blank contract, filled it in in accordance with the terms she wanted—$32,500 purchase price, $16,000 cash payment, and $1500 to be deposited as earnest money. This contract is referred to in the bill as "Exhibit 2." Appellant signed it in his presence. It was received in evidence over the objections of appellant's counsel. He took it to the garage man, but he refused to sign it. He then called up appellees and told them appellant would sell the property for $32,500, with a cash payment of $16,000, and had signed a contract to that effect. He asked them if they would sign it, and they said they would. He took the contract to their house, and they signed it in his presence after he inserted their names as the purchasers, and after one of them suggested there should be inserted a provision for pro-rating the 1925 taxes, he inserted that in the contract. The pro-rating clause was inserted at appellees' house before they signed it. The contract is as follows:

"*This Memorandum Witnesseth,* That Patrick McCrystall and Laura McCrystall hereby agree to purchase at the price of thirty-two thousand five hundred ($32,500) dollars, the following described real estate, situated in the county of Cook and State of Illinois legally known as lot 2 in subdivision of lots 1 to 4 inclusive in sub-lot 1 in the subdivision of block 31 in Kinzie's addition to Chicago (known as 207 E. Ontario St.) section 10, township 39 north, range 14 east of the third principal meridian, and Elizabeth A. Connor agrees to sell said premises at said price, and to convey to said purchaser a good and merchantable title thereto, by sufficient gen. warranty deed, with release of dower and homestead rights, but subject to (1) existing leases, expiring October 1st, 1925, the purchaser to be entitled to the rents from date of

delivery of deed; (2) all taxes and assessments levied after the year 1925; (3) any unpaid special taxes or special assessments levied for improvements not yet completed and to unpaid installments of special assessments which fall due after July 1st, 1925, levied for improvements completed; also subject to any party-wall agreements of record; to building line restrictions and building restrictions of record, and to an existing lien in form of trust deed in amount of ten thousand ($10,000) dollars, due February 1st, 1928, with interest at 6% per annum payable semi-annually, February 1st and August 1st. Pro-rating of 1925 taxes and interest up to date of delivery of deed. Premiums on insurance policies held by mortgagees shall be paid for by said first party *pro rata* for the unexpired time. Said purchaser has paid fifteen hundred ($1500) dollars as earnest money, to be applied on such purchase when consummated, and agrees to pay within five days after the title has been examined and found good, or accepted by him said insurance premium and the further sum of fourteen thousand and five hundred ($14,500) dollars, at the office of Baird & Warner, Inc. Chicago, provided a good and sufficient general warranty deed conveying to said purchaser a good and merchantable title to said premises (subject as aforesaid) shall then be ready for delivery. The balance to be paid as follows: $6500 as junior purchase money encumbrance due January 31st, 1928, with interest at 6% payable semi-annually. On or before due date, parties of the first part shall have the right to pay off the whole amount of this encumbrance or any part of it which they may be able to pay, with interest from the date hereof at the rate of..........per cent per annum, payable semi-annually, to be secured by the purchaser's notes and mortgage, or trust deed, of even date herewith, on said premises, in the form known as the Chicago Real Estate Board Form, for..........improved property.

"A certificate of title issued by the registrar of titles of Cook county, or complete merchantable abstract of title or merchantable copy, brought down to date hereof, or merchantable title guaranty policy made by C. T. & T. Co. for $32,500 shall be furnished by the vendor within a reasonable time, which abstract shall, upon the consummation of this sale, remain with the vendor, or his assigns, as part of his security, until the deferred installments are fully paid. The purchaser or his attorney if an abstract or copy be furnished shall, within ten days after receiving such abstract, deliver to the vendor or his agent (together with the abstract) a note or memorandum in writing, signed by him or his attorney, specifying in detail the objections he makes to the title, if any; or if none, then stating in substance that the same is satisfactory. In case material defects be found in said title, and so reported, then, if such defects be not cured within sixty days after such notice

*thereof, this contract shall, at the purchaser's option become absolutely null and void, and said earnest money shall be returned; notice of such election to be given to the vendor; but the purchaser may nevertheless elect to take such title as it then is, and in such case the vendor shall convey, as above agreed; provided, however, that such purchaser shall have first given a written notice of such election, within ten days after the expiration of the said sixty days, and tendered performance hereof on his part. In default of such notice of election to perform, and accompanying tender, within the time so limited, the purchaser shall, without further action by either party, be deemed to have abandoned his claim upon said premises, and thereupon this contract shall cease to have any force or effect as against said premises, or the title thereto, or any right or interest therein, but not otherwise.*

"Should said purchaser fail to perform this contract promptly on his part, at the time and in the manner herein specified, the earnest money paid as above, shall, at the option of the vendor, be retained by the vendor as liquidated damages, and this contract shall thereupon become and be null and void. Time is the essence of this contract, and of all the conditions hereof.

"The notices required to be given by the terms of this agreement shall in all cases be construed to mean notices in writing, signed by or on behalf of the party giving the same, and the same may be served either upon the other party or his agent.

"If the taxes and assessments to be paid by the vendor cannot be paid at time this contract is to be closed then the vendor is to pay same on or before May 1st, next ensuing.

"This contract and the said earnest money shall be held by Baird & Warner, Inc. for the mutual benefit of the parties concerned, and after the consummation of the sale he shall be at liberty to retain the canceled contract permanently, and it shall be the duty of said Baird & Warner, Inc. in case said earnest money be retained as herein provided, to apply the same, first, to the payment of any expenses incurred for the vendor by his agent in said matter, and second, to the payment to vendor's broker of a commission of 3% on the selling price herein mentioned for his services in procuring this contract, rendering the overplus to the vendor.

"Witness the hands of the parties hereto, this 7th day of May A. D. 1925."

Coleman testified he afterwards returned to the office of Baird & Warner, called appellant up and told her he had succeeded in getting the contract signed by appellees. He told her they were going to give him a check for the earnest money in the morning, and she told him to bring

the check and the contract to her house. The next day appellees gave him a cashier's check, payable to appellant, for $1500. He took it to her at her home, and also the contract. He showed them to her, and said that as the check was payable to her, if she would endorse it he could hold it as a deposit at Baird & Warner's to bind the deal. She endorsed the check in his presence. The check was introduced in evidence. While he was at her house a conversation occurred between him and her as to what would be necessary to have the deal consummated. He told her it would be necessary to give him all the papers, a guaranty title as she had received it when she bought it, all bills and all tax bills, and any receipts that remained outstanding; that he would take them down to the Chicago Title and Trust Company and they would be submitted to Baird & Warner. She inquired how quickly that could be done, and he said he would get the best service possible from the Chicago Title and Trust Company. He learned later from an attorney of Baird & Warner that it would be necessary to have the receipts for special assessments which had been paid, to submit to the Chicago Title and Trust Company. He told appellant when she endorsed the check it would be held in escrow by Baird & Warner and that if the deal did not go through, the check would be returned to appellees. The letter of opinion as to title submitted to Baird & Warner by the Chicago Title and Trust Company showed a second mortgage on the property, for which appellant held a release deed. He so informed appellant and she gave him the release deed to get the title clear. Shortly after she had given him the release deed she called at the office of Baird & Warner. Cook, the sales manager for Baird & Warner, called Coleman in where he (Cook) was talking with appellant and told him appellant seemed to think he had not acted in the right way, and was accusing him of misrepresentation and with having done things contrary to her instructions. She accused Coleman of forging her

name. After she denied signing the check and had been confronted with the proof that she did, she admitted it, and also admitted signing the contract but said there was something she didn't understand about it, and she didn't know Coleman was going to appellees with it; that she thought when she signed it, it was for some other parties. She said she would not deliver the deed, and made disparaging statements to Coleman and Cook and left the office. Before leaving she stated, in substance, that she gave the guaranty policy to Coleman merely to have it brought down to date, with a view of clearing any cloud on the title; that it was not given to Coleman in view of the deal he had made. She charged him with misrepresentation in regard to the endorsement of the check. At a later time he told her that the title was all clear and the deal was ready to be consummated; that appellees had mortgaged their property and had the money ready to pay the cash amount. He asked her to come to Baird & Warner's office to make the deeds and receive the money. She declined to do so. A little later he called her by telephone and told her appellees were ready to go through with their part of the contract and requested her to meet them at Baird & Warner's office the next afternoon and consummate the deal. She told him she was not coming down; that there was no use in asking her; that she would not sign the deed.

John L. Austin, an attorney, testified he was attorney for appellees at the time of the transaction herein referred to, and called at appellant's house to inform her appellees were ready to close the deal; that they had arranged for the money and would like to get the matter settled up. She asked him if he had seen any contract signed by her with appellees. He told her he had, and had also seen the $1500 cashier's check endorsed by her. She said they were both forgeries. He was at Baird & Warner's office with appellees when they went to close the deal. He had there appellees' cashier's check for $14,000, and possibly $500 in

currency, which he tendered under the conditions of the contract. Appellant did not appear at Baird & Warner's office at that time. Subsequently witness called at appellant's house again and told her he had been informed she had not been to Baird & Warner's office, and that he would like to have the business disposed of. She said she "would go down to-morrow." That, witness said, was possibly about the 5th of June, 1925. He waited until the 8th or 9th of June and called appellant by telephone and told her who he was. He inquired when she was going to straighten the matter up, and she replied she would not do anything about it. He told her appellees had been to Baird & Warner's office and tendered the money due under the contract, had accepted the title, had done their part, and he asked her to have the matter straightened up. She replied she would do nothing, and hung up the receiver.

Patrick McCrystall, one of appellees, testified the clause for pro-rating the 1925 taxes up to date of delivery of the deed was inserted in the contract before he signed it. After the contract was signed he and his wife mortgaged their property adjoining appellant's for $12,000 and went to the office of Baird & Warner with cashier's checks and currency to close the deal. That was around June 3, 1925. He testified appellees were ready, able and willing to perform the contract. Before that contract was signed they had refused to buy the property at the price asked by appellant, which was something around $37,000 or $38,000. Coleman brought the contract sued on to appellees' home and they signed it there. The clause for pro-rating the taxes was in the first contract submitted to appellees. They retained a copy of it, and discovered, when the contract sued on was presented, it had no clause about pro-rating the taxes, which the first contract did have.

The foregoing is a resume of the most important evidence for appellees necessary to present a general view of the case.

Appellant testified that the signature to "Exhibit 2" (the contract sued on) was her signature. The property involved she rented. She had trouble with the tenants and reduced the rent. She knew appellees. Coleman came to her at the Dearborn street property and talked to her about selling it. He inquired if she had any other property to sell, and she told him of the Ontario street property and that he could take it and see what he could do with it. He came back to her house the next day, which was about the third week in February, and they talked the matter over again. She told him she was sorry to sell the Ontario street property because she believed it would be valuable in a short time, but it was in a "nasty" neighborhood and she was going to sell it. Later he called to see her and told her he had a buyer for her Ontario street property. She asked him who the purchaser was, and he refused to tell her. She told him he would have to tell her before she would sign a contract. They came to no decision at that time. She wanted $35,000, half cash, for the property. He told her he could not get that much for it, and she told him to take it and do what he could with it. He did not tell her then who the purchasers were. She told him she would not sign anything except in the presence of her lawyer. She told him she would not sign a contract to sell before she knew who she was selling to; that she would want three or four days to look the purchaser up to see what he was worth. He asked her to sign the paper, and told her it was not a contract but was merely a paper stating she would sell for a certain price. He said he would take the paper to the purchaser and bring it back to her that afternoon. She then signed the paper and he took it away. When he brought it back later in the day he handed it to her and told her to tear it up. She saw appellees' names and inquired why he submitted the proposition to sell to them. She said she told him she and appellees were not friends and she would not deal with them. He told her

he did not see why she was so prejudiced against them; that they did not want the property. They did not sign the proposed contract and she tore it up. A few days afterwards Coleman came to her and told her appellees had made up their mind they wanted the property. She said she would not sell to them, and said nothing further about negotiations with them. Coleman told her appellees had secured a lawyer and were going to make out a contract and he would bring it and show it to her. She told him to keep away from them. A few days afterwards he returned to her residence with a proposed contract from appellees, handed it to her and said it was the contract proposed by appellees; that they signed it and for her to sign it. She remonstrated against his annoying her about selling to appellees. He told her not to let her prejudice run away with her; that she need never see them; that she could put the notes in the bank and appellees would pay them there and never come in contact with her. She said nothing he would say would change her mind. He left the proposed contract of appellees at her house and went away. The next morning he returned and said he wanted the contract. She still said she would not sell to appellees. She gave him the contract and he went away. Seven or eight days later he returned to her residence and said he had a buyer for the Dearborn street property and also a buyer for the Ontario street property. He said the purchaser for that property was a man who owned a garage on West Superior street but did not tell her his name. He said it would make no difference, if she was willing to sell for a price named, whether she signed the paper first or the other party. He made out the contract for the sale of the Ontario street property and she signed it. That is complainants' "Exhibit 2." Appellees' names were not in it when she signed it, nor was the clause pro-rating the taxes for 1925. There was no name in the contract as purchaser. Coleman took the proposed contract with him and a couple

of days later called her up and told her he did not get it signed; that the garage man on West Superior street refused to take the property. About May 8 Coleman called her by telephone and told her he had got the contract signed. He said appellees signed it. She protested against dealing with appellees, and he asked why she cared if she got the money. The following day Coleman came to her apartment. The contract she signed was signed April 7, and she never saw it again until it was offered in evidence. Coleman did not show her the original cashier's check for the earnest money. He came to her apartment later and asked her if she was going to give him a deed. She told him no, and he said appellees were going to take their check back. She said for them to take it back; that she had nothing to do with it and had never seen the check. Coleman kept coming to her apartment for two weeks, and each time told her if she did not give him a deed appellees were going to take their check back. She said she always told him to give it back—that she didn't want it. Later he came back and asked her if she knew there was a flaw in her title, and she said there was none. He told her she had not paid for a sidewalk laid by the city; that the records in the office of the Chicago Title and Trust Company showed the city built the walk and that she had not paid the bill. She said she knew nothing about it. He told her there was another flaw—a second mortgage—and she said there was but she had paid it. He told her the release deed was not signed by a notary public. She went down to the bank the next morning and got her papers relating to the title. She took them home in an envelope and removed the release deed but not the guaranty policy. She did not look in the envelope for that. She said she was going to take her papers to a lawyer and Coleman advised her not to do that. He put the release deed in his pocket, took the envelope, with the other papers in it, which was lying on the sewing machine, and put that in his pocket and said the Chicago Title

and Trust Company would fix it up for nothing. She objected to his taking her papers, and he said he would bring them to her the next day if they could get through with them by that time. He never mentioned a check for $1500, except to say that if she did not give him a deed appellees would take their check back. She never saw the check. She testified it was her signature on the original check, complainants' "Exhibit 3." Coleman brought it up about the last of June and said appellees were going to take it back unless she made the deed. He pulled the check out of his pocket and said it was payable to her, and she would have to endorse it so that "we" can deposit it. She did not understand why she should endorse the check, and Coleman told her it was so they could deposit it and give appellees Baird & Warner's check to pay them back. She endorsed the check. That was about the last day of May or the first of June. The next thing she heard she was called up and asked to come to Baird & Warner's office. That was four or five days after she endorsed the check. She was told appellees were there and was requested to come to the office. She refused. There were further conversations between her and persons employed by Baird & Warner, but she refused to sign a deed to appellees. Appellant further testified at great length concerning her differences with appellees and why she refused to sell to them and what they said and did, which we deem it unnecessary to repeat. She also went at great length into her frequent conversations with Coleman, much of which we regard as unimportant and will not repeat.

Coleman was recalled as a witness for appellees in rebuttal and contradicted much of appellant's testimony. He denied categorically that she objected to endorsing the check for the earnest money.

The master reported, and the court decreed, that appellant and appellees entered into a contract for the sale and purchase of the property May 7, 1925, and the court also

decreed that it should be specifically performed according to its terms; that appellees had always been ready, able and willing to perform, but that appellant declined to perform the contract on her part.

Before appellees signed the contract it had been signed by appellant, naming the purchase price and the terms and conditions of payment, but at the time appellant signed it it did not contain the names of appellees as purchasers nor the clause for pro-rating the taxes of 1925. It is quite apparent from appellant's testimony and attitude throughout the case that she did not like appellees and was averse to selling to them. Her defense to the suit is that she never signed the contract sued on, because at the time she signed it it did not have appellees' names in it as purchasers nor the clause pro-rating the 1925 taxes. In the briefs much space is devoted to an argument that the contract was voidable under the Statute of Frauds. Nowhere in any of appellant's pleadings is the Statute of Frauds expressly mentioned as a defense. It is true, it may be availed of as a defense without specifically mentioning it if facts are stated sufficiently showing that the defendant seeks the protection of the statute. (*Koenig* v. *Dohm,* 209 Ill. 468; *McClure* v. *Otrich,* 118 id. 320; *Highley* v. *Metzger,* 187 id. 237.) Appellant does not deny this rule of law, but contends her pleadings distinctly deny the existence of any written agreement signed by her, and that it is a sufficient pleading of the Statute of Frauds to authorize it to be relied upon as a defense. It is true, appellant denied making the written agreement sued on. The contract contains her acknowledged signature, but because it did not contain the names of appellees as purchasers and the clause pro-rating the taxes for 1925 at the time she signed it she claims it was not her contract. The record does not show that the Statute of Frauds was mentioned or referred to as a defense on the hearing of the case but it was first invoked in this court. We are of opinion the Statute of Frauds was not

pleaded or relied on as a defense in the court below, but if it had been, we think the defense was not sustained by the proof. Appellant knew when she signed the contract the name of the purchaser was left blank. She thereby gave Coleman, who was her agent to sell the property, implied authority to fill in the name of a purchaser who would agree to the terms in the contract. *Butler* v. *United States,* 21 Wall. 272; *City of Chicago* v. *Gage,* 95 Ill. 593; *Crain* v. *First Nat. Bank of Jacksonville,* 114 id. 516.

The master reported, and the court expressly decreed, that the firm of Baird & Warner, represented by Coleman, was the agent of appellant and at no time the agent of appellees.

The only alteration made in the contract after appellant signed it was that the taxes for 1925 be pro-rated. That was for the benefit and to the interest of appellant. It had been in the first contract drawn but had been omitted in drawing the contract sued on, and at the suggestion of one of appellees it was put in the contract before they signed it. No change was made in the purchase price or the terms of payment, and we are of opinion it did not void the contract. Appellant cites *Keller* v. *State Bank of Rock Island,* 292 Ill. 553, to sustain her defense. The instrument considered in that case was a negotiable instrument, and the Negotiable Instrument act provides that an alteration which changes a sum payable, either for principal or interest, is a material alteration. In *Linington* v. *Strong,* 107 Ill. 295, after the terms of a contract had been agreed upon, one of the parties in transcribing it made certain alterations. The other party signed the contract without reading or discovering the alteration, and when the contract was sued upon set up it had been altered and was not the contract agreed upon. The alteration was not to the injury of the party setting up the defense. The court said: "The modification of the contract making payments for royalties payable quarterly seems to have been affirmed and acquiesced in after

that change was brought to appellant's attention. The modification of the language requiring the payment of royalties on a given number of pinchers instead of requiring the manufacture of the same number each year and the payment of a royalty on each did not change the legal effect of the contract to appellant's injury." In *Bindseil* v. *Federal Union Surety Co.* 115 N. Y. Supp. 447, the court said: "A failure to insert in a written agreement a provision which the parties agreed should be inserted has never been held to be a fraudulent alteration of an agreement which discharged all the parties to it from any obligation under it."

We are of opinion appellant ratified the contract after it was signed by both parties. The negotiations for the sale of the property covered a considerable period of time, during which there were frequent conversations between appellant and Baird & Warner's salesman, Coleman. Appellant testified they conferred about fifty times. After the contract sued on had been signed by both parties she delivered to Coleman her guaranty policy, tax bills, release deed of second mortgage, and endorsed the check payable to her for the earnest money. She knew it was necessary that an opinion be procured showing her present title. She was a woman of considerable experience in real estate matters and had sold several lots. She must have known that it was not necessary for her to endorse the check for the purpose of returning it to appellees. She testified she told Coleman it was unnecessary to endorse it for that purpose, but she did endorse it. It is most highly improbable that after all the controversy she and Coleman had, according to her testimony, about selling the property to appellees, he would come to her house and take therefrom, without leave or license, the papers necessary to have the title cleared up. He was a salesman for Baird & Warner. He had no interest in commissions for making the sale but was working on a salary.

The master found Coleman used his best endeavors to sell the property; that appellant delivered to him, as her agent, the contract concerning the terms on which she was willing to sell; that he had express authority from her to fill in the name of the purchaser; that after the contract had been signed by appellees and the earnest money of $1500 given him, she endorsed the check with full knowledge of the purpose for which it was given, and delivered to him her guaranty policy to procure an opinion of title from the Chicago Title and Trust Company; also her receipt for the general taxes for 1924 for the purpose of prorating the taxes for the year 1925 in accordance with the contract. We think the master's findings are sustained by the evidence. The proof abundantly shows appellant was willing and anxious to sell her property for the price and on the terms mentioned in the contract. She does not deny, but admits, she would have sold it to the garage man spoken of during negotiations by Coleman as a probable buyer, but she was so intensely prejudiced against appellees that she concluded not to perform the contract to sell to them, and sought to void it, notwithstanding her ratification, by claiming the contract had been altered. Of course, she had a right to sell to whom she pleased and to refuse to sell to persons she did not desire to deal with, but after all she did subsequent to signing the contract she put it out of her power to avoid performance of the contract from mere whim or prejudice. Her complaint is not that the contract does not require appellees to pay the purchase money she asked according to the terms she imposed, but that she did not want to sell to them.

The circuit court correctly decreed the specific performance of the contract, and the decree is affirmed.

*Decree affirmed.*